**FIELDING et al. v. ALLEN et al.**

United States District Court
S. D. New York.

June 22, 1951.

138

Hays, Podell, Algase & Feuer, New York City, General Counsel for plaintiffs and plaintiffs-intervenors. Mortimer Hays, Mortimer Feuer, and Morton Roth, New York City, of counsel.

Boehm & Fischman, New York City, for plaintiff Bennett I. Fielding. Bernard D. Fischman, New York City, of counsel.

Sidney L. Garwin, New York City, for plaintiff-intervenor Irving W. Mencher.

Moroney, Ettinger & Pottish, New York City, for plaintiffs-intervenors Edward A. Miller and Mary V. Miller.

Holtzmann, Wise, Shepard & Kelly, New York City, for defendants Charles Allen, Jr., and others. Simon H. Rifkind, New York City, of counsel.

Frank P. Broz, New York City, for defendants Jacob L. Holtzmann and Lillian Holtzmann.

Whitman, Ransom, Coulson & Goetz, New York City, for defendant Ogden Corporation. Henry S. Reeder, New York City, of counsel.

William Mertens, Jr., New York City, for Augusta Levin.

Leo B. Mittelman, New York City, for George Ferngold.

Louis H. O. Fischman, New York City, for Lillian Levington.

Mendel Lurie, New York City, for Nathan Kirschbaum and Jerome Kirschbaum.

Israel Beckhardt, New York City, for Harry R. Baker.

Morris J. Levy, New York City, for Isidore Sonnenshine.

S. H. KAUFMAN, District Judge.

This is a motion for approval by the Court, pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., of a proposed settlement of a stockholders' derivative suit brought on behalf of Ogden Corporation.

The matter was referred to Thomas F. Boyle, Esq., as Special Master, to inquire into the fairness, reasonableness and adequacy of the proposed settlement, to take evidence and to report to the Court his opinion as to the advisability of the settlement. Pending the submission of the Special Master's report, the motion for

approval was held in abeyance. The Special Master held hearings and filed a report in which he recommended that the settlement be approved.

· Thereafter, the Court directed the mailing of notice to all the stockholders of Ogden of a hearing to be held before the Court upon the motion for approval of the settlement, the confirmation of the Special Master's report, and judgment in accordance with the terms of the settlement stipulation.

The hearing has now been held. At the hearing several stockholders appeared by attorneys and objected to the proposed settlement.

Affidavits and documentary and oral evidence with respect to the fairness of the proposed settlement were received.

The action was instituted on December 24, 1948. All attorneys who had participated in the suit prior to the settlement proposal were in favor of the settlement. The objectants took no part in the action until after the Special Master's report was filed.

The action is a stockholders' derivative suit brought by stockholders of Ogden Corporation, on behalf of that corporation, against certain present and former officers and directors of Ogden Corporation, the firm of Allen and Company (hereinafter sometimes referred to as "Allen"), Jacob Holtzmann and other persons who either purchased certain securities directly from Ogden or subsequently became owners of a portion of those securities.

The action arises out of the sale in December, 1945 by Ogden to defendant Holtzmann of all of the stock of Litchfield & Madison Railway Company (hereinafter referred to as "Litchfield"), both common and preferred, all of the stock of Mt. Olive & Staunton Coal Company (hereinafter referred to as "Mt. Olive") and an indebtedness of Mt. Olive to Ogden in the amount of $1,162,844, all for a consideration of $1,758,883, plus the payment by Litchfield to Ogden of a $300,000 dividend. (Thus, the proponents of the settlement contend that the purchase price was really $2,050,000, after certain adjustments.)

Holtzmann immediately resold 5,000 shares of Litchfield preferred stock to an insurance company for $490,000.

Within a short time after his purchase Holtzmann agreed to sell to Allen and Company 95% (later changed to 70%) of the remaining package of securities and indebtedness which he purchased from Ogden. ·

Approval of the Interstate Commerce Commission was necessary for the sale of the Litchfield stock to Allen. The Commission thereafter approved the sale of the Litchfield stock to Allen and found the terms and conditions just and reasonable, and the sale to Allen was consummated on July 10, 1946.

During the following month Holtzmann sold to various individuals another 25% of the package of securities in various percentages, but at the same proportionate price as the sale to Allen.

Ten (10%) per cent was divided among Mr. Grand, counsel for Litchfield, Mr. Leahy who was elected president of Litchfield and various local people who it was thought could be helpful to management. None of these was in any way connected with the management of Ogden.

The largest purchaser from Holtzmann (out of the 25%) was the Baird Foundation, a charitable trust, to the extent of 15% of the package. Mr. Baird, who founded the trust, had been a director of Ogden but had ceased to be such as early as 1941. He was also the holder of one-tenth of one per cent of the outstanding stock of Atlas Corporation (which, in turn, owned 80% of the stock of Ogden).

Some time in 1947 Baird apparently felt that the accelerated decline in earnings of Litchfield made it an imprudent investment for the trust to hold. Accordingly, he sold 4% of the package to Mr. Sindeband and his wife, and 4% to Mr. Fogg and his wife.

Mr. Sindeband was a director and vice-president of Ogden at the time of the sale from Ogden to Holtzmann. He did not act in the negotiations for that sale. Mr.

140

Fogg was secretary of Ogden at the time of that sale. There is no evidence that he participated in the negotiations for that sale. At the time of that sale from Ogden to Holtzmann, Messrs. Sindeband and Fogg were both directors of Mt. Olive; Fogg was secretary of Mt. Olive; Sindeband was director and Fogg was secretary and assistant treasurer of Litchfield.

After that sale Sindeband continued as a director and Fogg continued as vice-president and secretary of Litchfield. In addition, Fogg was appointed director of Litchfield. Fogg and Sindeband continued on as directors of Mt. Olive and Fogg became vice-president and secretary of Mt. Olive.

The complaint contains two causes of action. The first cause of action attacks the sale from Ogden to Holtzmann on the ground that the consideration was grossly inadequate; that the transaction was contrary to the interests of Ogden; and that it was accomplished pursuant to a wrongful conspiracy with Ogden's officers and directors.

The second cause of action is confined to the sale of the stock of Litchfield; it alleges that the sale of that stock from Ogden to Holtzmann was consummated in violation of the Transportation Act of 1920, 49 U.S.C.A. § 1 et seq., in that Holtzmann was in reality acting as agent and dummy for Allen and Company; that the latter, at the time of the transaction, controlled another carrier; that, therefore, approval of the Interstate Commerce Commission was required for the sale; that in the proceedings for such approval the Commission would inquire into the adequacy of consideration, in view of the fact that there were minority stockholders of Ogden; that although the later sale from Holtzmann to Allen also required Commission approval, and such approval was obtained, the Commission did not inquire into the question of adequacy of consideration in view of the fact that there were no minority interests involved.

After answering the complaint, Ogden moved for an order requiring plaintiffs to furnish security pursuant to New York General Corporation Law, Consol.Laws, c. 23, § 61–b. The District Court directed the furnishing of such security and further directed that if such security was not furnished both causes of action should be dismissed. On appeal to the Court of Appeals for this Circuit, that Court reversed the decision of the District Court as to the second cause of action, holding that security was unnecessary as to that cause of action, and sent the case back to the District Court for further proceedings, including consideration of the question whether the first cause of action, as to which security was concededly required, should be stayed rather than dismissed. The question of stay or dismissal, thus remanded to the District Court, has never been brought on for determination by that Court.

At the time of the transactions complained of, Atlas Corporation owned 80% of the stock of Ogden. Before the pending settlement proposal was agreed upon, Atlas sold its stock in Ogden to Allen and Company. It is not disputed that one of the reasons that motivated Allen in making this offer of settlement is that, in its capacity as 80% stockholder of Ogden, it would to a large extent recoup the cost of the settlement.

Under the settlement proposal now before the Court, Allen and Company will pay to Ogden Corporation the sum of $375,000 in settlement of any claims which are asserted in the pleadings against any or all of the defendants named in the action, and any claims against any of said defendants which arise out of or in connection with any of the transactions referred to in the pleadings. Ogden Corporation is to pay all costs and disbursements, the Special Master's fees, and the allowances to be fixed by this Court for plaintiffs' attorneys and any other counsel fees and expenses, such amounts to constitute liens against the amount of the settlement. The individual defendants who are or were directors, officers and/or employees of Ogden have agreed that they will make no application for reimbursement or indemnification by Ogden for their expenses and counsel fees.

In Winkelman v. General Motors Corporation, D.C.S.D.N.Y.1942, 48 F.Supp. 490, at p. 493, Judge Leibell said:

"The role of the Court on the compromise of a stockholder's derivative action is described by Mr. Justice Rosenman in Neuberger, &c. v. Barrett et al., June 25, 1942. He wrote:

" 'The role of the court is to see that the compromise is fair and reasonable under the circumstances and that no collusion or fraud has been practiced in the consummation of the settlement. To do this the court must weigh the probabilities and possibilities of victory or defeat as indicated by the legal or factual situation presented. If such considerations lead to the conclusion that the settlement agreed upon by the plaintiffs in the suit is not unfair or unreasonable to the corporation (in which all the other stockholders have their interest), then the action of the plaintiffs in compromising the suit should be approved.' ".

Perhaps an ever severer standard is suggested by Upson v. Otis, 2 Cir., 155 F.2d 606, and Cohen v. Young, 6 Cir., 127 F.2d 721.

Considering then the probabilities and possibilities of victory or defeat, two questions appear to be critical. The answers to these questions largely determine the merits of the first cause of action, and perhaps of the whole case:

1. Did the directors act honestly and disinterestedly and for the best interests of the corporation, without any motive or effect of private profit to the directors or their friends?

2. Was the price at which the securities were sold fair and reasonable?

If on the trial plaintiffs should succeed in establishing the negative of the first question, i. e., if they should show that the directors were not acting honestly and with fidelity or were trying to profit themselves or had some personal interest, then the defendants would be under a heavy burden to convince the Court that the transaction was fair and reasonable in all respects and that the price was fair. If, however, plaintiffs should be unable to establish the negative of the first question, then plaintiffs would have a very heavy—and probably unsustainable—burden to show that the price is so unfair to the corporation that the Court should upset the transaction or hold the directors liable for entering into it.

As to the first question—did the directors act honestly and with an eye solely to the best interests of the corporation or did they act in bad faith or with some personal interest in the transaction—there is an almost complete absence of evidence or even suggestion of any credible motive why the directors of Ogden or Atlas Corporation, its 80% stockholder, or Odlum, the dominating figure of Atlas, should have entered into the transaction with a view to anything but the best interests of Ogden.

It has been suggested that the directors of Ogden were dominated by Odlum, who seems to be the chief figure in Atlas. But Atlas had an 80% stock interest in Ogden. There is no suggestion that Odlum had any conflicting interests. In the circumstances, there is no evidence or suggestion of any motive that Odlum or Atlas could have had for entering into the transactions other than the best interests of Ogden as they saw them.

The objecting stockholders suggest that Mr. Baird may have exercised an improper influence on the directors of Ogden and induced them to enter into a transaction otherwise than with an eye single to the best interests of Ogden. But Mr. Baird was not a director of Ogden. True he had been one, but not since 1941. While his relations with Odlum and Atlas were apparently friendly, they were by no means dominating or such as to suggest any reason why Atlas should hurt its 80% interest in Ogden for Baird's benefit. Baird owned 1/10th of 1% of the outstanding stock of Atlas, again certainly not enough to suggest domination. And it appears fairly clear that Baird's participation in the transaction was not contemplated until some months after the sale by Ogden had been closed.

It is suggested also that Sindeband and Fogg may have improperly influenced the directors of Ogden. But they were not

dominant figures in Ogden; and they did not personally participate in the sale negotiations. Furthermore, they bought from Baird a year after the sale by Ogden and there is no evidence to support the view that at the time the sale by Ogden was made there was any intention that they should participate as purchasers, either directly or indirectly. The sale to them by Baird is perfectly explicable, both because of the Baird Foundation's own investment policy and because Sindeband and Fogg continued as officers and directors of Litchfield and of Mt. Olive, and it made sense for them to have some stock participation in the companies.

It is apparent that plaintiffs' case on the first question—the honesty, good faith and disinterestedness of the directors—would be very weak; indeed no case at all. And if plaintiffs should fail on this point then plaintiffs would have a very heavy burden indeed to establish the unreasonableness of the price.

■■ To begin with, plaintiffs would be faced by the "business judgment rule". That rule has been stated as follows by Mr. Justice Shientag in Bayer v. Beran, Sup., 49 N.Y.S.2d 2, 6:

"To encourage freedom of action on the part of directors, or to put it another way, to discourage interference with the exercise of their free and independent judgment, there has grown up what is known as the 'business judgment rule'. Gamble v. Queens County Water Co., 123 N.Y. 91, 99, 25 N.E. 201, 202, 9 L.R.A. 527; Weinberger v. Quinn, 264 App.Div. 405, 408, 35 N.Y.S.2d 567, 570; Everett v. Phillips, 288 N.Y. 227, 232, 43 N.E.2d 18, 19; Kalmanash v. Smith, 291 N.Y. 142, 155, 51 N.E.2d 681, 687. 'Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient.' Pollitz v. Wabash R. Co., 207 N.Y. 113, 124,

100 N.E. 721, 724. Indeed, although the concept of 'responsibility' is firmly fixed in the law, it is only in a most unusual and extraordinary case that directors are held liable for negligence in the absence of fraud, or improper motive, or personal interest."

There is more than sufficient doubt that this is the "unusual and extraordinary case" in which the Court would overrule the business judgment of the directors, in the absence of fraud, improper motive or personal interest.

It is true that the objectors say that the value of the assets thus sold by Ogden for $2,050,000 (or $1,750,000 as the objectors contend) was really in excess of $6,000,000. And the complaint alleges that this value was at least $7,625,000. But I do not believe that the substantial evidence would support anything like those figures.

■ The most reliable evidence of the fair market price of a block of securities is the amount actually arrived at in careful arms-length negotiations between an experienced buyer and an experienced seller. And apparently that is precisely how the price for which these securities were sold to Holtzmann was arrived at. The negotiations between Odlum, acting for Ogden, and Allen for the purchase of the properties extended over a period of more than six months. Apparently each side tried to drive the best bargain possible under all the circumstances. Odlum receded from a substantially higher figure to $2,100,000. Allen had offered $2,000,000 and in December, 1945 an agreement was reached at $2,050,000, of which $300,000 was to be paid to Ogden by the payment of a dividend from Litchfield. Thereafter, for the reasons hereinafter mentioned Holtzmann became the purchaser instead of Allen. But it is clear that the price of $2,050,000 was reached as the result of long and careful negotiations between two experienced negotiators.

The price thus determined was certainly not too low in relation to previous offers. The securities had been on the market for nearly five years. There were a number of inquiries concerning them and attempts were made to interest likely purchasers, e.

g., the Chicago & Northwestern Railway. In August, 1944 a tentative informal offer of $1,800,000 was made but this was rejected. In October or November, 1945 there was another offer of $1,450,000, which was also rejected. No better offer was ever obtained than the offer finally accepted by Ogden.

The objectors' chief reliance seems to be on appraisals (some made for the objectors' use in this litigation and some before there was ever a litigation), and on price-earnings ratios, and on comparisons of the price at which these securities were sold with the price at which other allegedly comparable securities were selling at the same time. And of course the proponents of the settlement say that these figures are not reliable; and that the companies and securities with which objectants compare these securities are not really comparable. While a court must frequently base its action and its judgment of values on appraisals and price-earnings ratios, it still seems to me that the most reliable evidence is the evidence of the price at which a willing purchaser and a willing seller finally contract to buy the particular property after an honest negotiation, particularly when that price is in line with previous offers and where the property has been on the market for five years.

In 1938, when the earnings of Litchfield and Mt. Olive were roughly comparable to what they were in 1945, Stone & Webster Engineering Corporation made a survey and a valuation appraisal of the properties and assigned to Litchfield and Mt. Olive a combined value of $1,155,-236. Subsequently they reappraised the properties as of June 30, 1938 and gave them a combined value of $1,240,201. Other appraisals prior to 1940 gave values between $1,925,631 and $2,591,952. Another study in April, 1943 produced a valuation for Litchfield alone of $2,423,000. Other estimates of value during the same year indicated a fair value for Litchfield from $2,400,000 to $2,700,000 and for Mt. Olive of $250,000.

The net worth of Litchfield according to its balance sheet as of December 31, 1945, was $1,644,636. If the Interstate Commerce Commission's valuation for rate making purposes of the carrier property were substituted for the amount carried on the books, the indicated net worth of Litchfield would be reduced to $1,011,399. The indicated net worth of Mt. Olive at December 31, 1945 was $400,779 according to its books; and, in addition, $1,162,844 was owed to Ogden.

The earnings of Litchfield for the years 1940 to 1946 after taxes were as follows:

| 1940 | $258,983. |
| 1941 | 455,773. |
| 1942 | 551,951. |
| 1943 | 658,170. |
| 1944 | 375,062. |
| 1945 | 406,469. |
| 1946 | 270,943. |

Litchfield had benefited very substantially taxwise because it was included in the consolidated tax return of Ogden and its subsidiaries. That tax advantage would no longer be available to it when Litchfield ceased to be a part of the Ogden consolidated group.

Mt. Olive had a net profit in 1941 of $14,630. For several years immediately preceding it had had heavy losses. Between 1944 and 1947 Mt. Olive's net profits ranged between $21,791 and $200,012 in a steady increase. These figures reflected in some cases payments of interest to Ogden.

It appears that there was fear at the end of 1945 that railroad earnings would decline considerably with the change from a war time to a peace time economy.

While a valuation of over $6,000,000 is placed on these properties by the objectants' expert, this valuation is made in the course of a litigation, and also has the benefit of hindsight.

It is unnecessary to discuss here the question of valuation at greater length. The whole subject of valuation and previous offers is set forth with great clarity and thoroughness in the Special Master's report.

I should add that I have cited these figures and appraisals not in order to show the price at which the Court would have sold the properties if the Court had had that responsibility. That, after all, is not the problem before me. These appraisals and figures are cited to show that the price at which the properties were finally sold

was within a range of reasonableness, such that the Court would probably not interfere with the judgment of the directors.

The first cause of action is too weak to justify withholding approval of the settlement as to that cause of action.

 The second cause of action is based on a charge of violation of the Transportation Act. The cause of action is novel. It rests on the premise that the Transportation Act required a disclosure to the Interstate Commerce Commission that Allen and Company were the ultimate purchasers of Litchfield, and that if such a disclosure had been made the Commission would have required a hearing which would have included investigation by the Commission of the fairness of the price. From this it is argued that the sale is void, perhaps regardless of adequacy of consideration.

It appears from the testimony that defendants would contend that there was a disclosure to the Commission of the full facts, i. e., that it was originally contemplated that Allen and Company would be the purchasers; that a time deadline was put on the transaction by Ogden; that it was impossible to have a Commission hearing before that time deadline; that Holtzmann was Allen's counsel; that Holtzmann intended to buy the securities on his own credit; and that he intended to resell to Allen.

In the face of this evidence it may well be that there was no violation of the Transportation Act. Furthermore, even if there were a violation, it is not at all clear what the remedy would be. Perhaps, as objectants contend, the result of a violation would be that the sale is void regardless of adequacy of consideration; but, on the other hand, it may be that the remedy would merely be a hearing before the Commission. And if there is a hearing before the Commission, unless objectants could establish inadequacy of price, they would again fail.

It appears that this second cause of action is quite tenuous.

Finally, the attorneys who actively conducted this litigation until the offer of settlement all recommend this settlement. Of course this is not conclusive on the Court. Cohen v. Young, supra. But it is certainly a fact entitled to considerable weight

One further point made by the objectors to the settlement should be mentioned. It appears that the Bureau of Internal Revenue is making a claim against Ogden for back taxes in a very substantial amount. If that claim should be sustained, Ogden may wish to make a claim over against Litchfield and Mt. Olive, which were members of the consolidated group which filed the income tax returns in question. Objectants suggest that it should be a term of the settlement that, if such a claim is made, Litchfield and Mt. Olive will not resist the claim of Ogden for contribution. It appears to me that that matter is entirely separate from this settlement. Neither Litchfield nor Mt. Olive are parties to this litigation or settlement; the releases will not run in their favor. If Ogden has a claim for contribution against Litchfield and Mt. Olive, that claim will not be sacrificed or affected by this settlement. I do not think I can prudently require that this settlement be rejected unless Litchfield and Mt. Olive agree to waive any objections they may have to contribution in the hypothetical case discussed.

The settlement is approved. The report of the Special Master is confirmed. Judgment will be entered in accordance with the stipulation of settlement. Submit order.