**Richard J. STULL, Plaintiff,**

v.

**George P. BAKER et al., Defendants.**

**Salha DARWISH and Fahmi Peress, as Executors of the Estate of Saleh E. Darwish, Plaintiffs,**

v.

**George P. BAKER et al., Defendants.**

**Nos. 69 Civ. 2046 and 73 Civ. 3600.**

United States District Court, S. D. New York.

Feb. 27, 1976.

---

**6.** There is diversity as to defendant Campbell.

Stull, Stull & Brody, New York City, for plaintiff Stull; Robert A. Stull, New York City, of counsel.

Milberg & Weiss, New York City, for plaintiffs Darwish and Peress; Lawrence Milberg, Melvyn I. Weiss, David J. Bershad, New York City, of counsel.

Debevoise, Plimpton, Lyons & Gates, New York City, for the individual defendants (in both actions) and Defendant Lockheed Aircraft Corp. (in Darwish); Samuel E. Gates, Robert L. King, New York City, of counsel.

Frank H. Gordon, New York City, for defendant Lockheed Aircraft Corp. (in Stull).

O'Melveny & Myers and Homer I. Mitchell, Los Angeles, Cal., of counsel for defendant Lockheed (in both actions).

White & Case, New York City, for defendant Arthur Young & Co., David Hartfield, Jr., Paul J. Bschorr, Fredric S. Newman, Robert G. Haile, Jr., New York City, of counsel.

CONNER, District Judge:

Presently before the Court is an application pursuant to Rules 23(e) and 23.1 F.R.Civ.P., for an order approving the settlement and dismissal of the individual, class action, and derivative claims set forth in the above-captioned actions. Also before the Court is a joint application by Stull, Stull & Brody, Esq., plaintiff's counsel in the *Stull* action, and their counterparts in the *Darwish* action, Milberg & Weiss, Esqs., for the award of attorneys' fees.

## I.

## BACKGROUND

*The Stull Action*

The *Stull* action was filed on May 12, 1969 by Richard J. Stull, a purchaser of common stock in Lockheed Aircraft Corporation (Lockheed), as both a class action on behalf of other purchasers of

Lockheed common stock and a derivative action on behalf of Lockheed. Defendants were charged with having violated Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5.

In a Memorandum dated July 24, 1973, Judge Bryan declared the *Stull* action to be maintainable as a class action, but struck the Section 14(a) claims and limited the class to persons who had purchased Lockheed's common stock between September 30, 1965 and January 24, 1966 (the *Stull* Class). In the same Memorandum, Judge Bryan granted summary judgment in favor of Lockheed's independent public accountants, defendant Arthur Young & Company, on all claims against it except the Section 10(b) derivative claim.

Both the derivative and class action claims asserted in the *Stull* complaint relate to the circumstances underlying Lockheed's contracting for, production of and ultimate catastrophic financial losses in connection with a huge military transport airplane commonly known as the C–5A. The award of the C–5A contract to Lockheed was publicly announced by the United States Department of Defense on September 30, 1965, which is the beginning date for the *Stull* Class. The terminal date for the *Stull* Class—January 24, 1966—is the date upon which plaintiff purchased his stock.

The gravamen of the charges of wrongdoing in the *Stull* complaint is that the individual defendants violated the federal securities laws by failing to disclose and/or misrepresenting facts concerning alleged losses and cost overruns incurred by Lockheed in connection with its production of the C–5A.

The class action claims assert that these nondisclosures and/or misrepresentations caused the market price of Lockheed's common stock to be artificially inflated to the detriment of the members of the *Stull* Class, who purchased such stock before public disclosure of the relevant facts.

The derivative claims, as now constituted, assert in substance the facially inconsistent claim that, by reason of the same alleged wrongdoing, Lockheed suffered damages as a purchaser or seller of securities in 1) the issuance by Lockheed of certain options for the purchase of its own stock, 2) the issuance by Lockheed of a public convertible bond issue in March 1967, and 3) an exchange of 100,-000 shares of Lockheed common stock for all the shares of Aviquipo, Inc. in December 1969.

All of the defendants named in the *Stull* action have filed answers which deny the material allegations of the *Stull* complaint and which assert various affirmative defenses.

*The Darwish Action*

Prior to his death in January 1974, Saleh E. Darwish attempted to intervene in the *Stull* action. The application was heard by Judge Bryan at the same time as the class action and summary judgment motions described above. Judge Bryan refused to allow the intervention. Thereafter, in August 1973, Mr. Darwish commenced the later of the above-captioned actions as a class action on behalf of all Lockheed security holders who purchased Lockheed securities "on and after March 3, 1967" and who either still held their Lockheed securities at the time of the commencement of the *Darwish* action or sold those securities at a loss "after the true facts came to the knowledge of the plaintiff and the public."

After Darwish died, a protracted will contest delayed the appointment of an executor. When this fact was brought to Judge Metzner's attention, he struck the class allegations asserted in the *Darwish* complaint. Subsequently, executors were appointed and, by Order entered on June 18, 1975, the Executors of the Estate of Darwish were substituted as plaintiffs solely for the purposes of the then contemplated settlement of the action.

The charges of wrongdoing asserted in the *Darwish* action are, in substance, the same as those alleged in the *Stull* action's class claims. As in the *Stull* action, defendants have filed answers denying all the material allegations in the complaint and asserting affirmative defenses.

### Other Actions

In addition to the *Stull* and *Darwish* actions, a purported class action, entitled *Colonial Realty Corporation v. Lockheed Aircraft Corporation,* Civil Action No. 2641–69, was filed in the United States District Court for the District of Columbia on behalf of purchasers and holders of certain convertible debentures issued by Lockheed pursuant to a March 21, 1967 registration statement. Class action certification was denied on January 28, 1971 and the action apparently was dropped.

Yet another action, styled *Richland v. May,* was commenced on May 15, 1970 in New York State Supreme Court, New York County. The action, which alleged violations of the Securities Exchange Act of 1934, was removed to this Court (70 Civ. 2299 DNE) and ultimately transferred to the Central District of California, where it was abandoned.

### Proceedings Leading to Settlement

The affidavits and memoranda before the Court, together with the Court's own docket sheet, attest to the fact that the consolidated actions have been vigorously litigated. Since shortly after the inception of the *Stull* action, counsel have engaged in extensive motion practice and discovery procedures.

The discovery included the review and analysis of many thousands of documents, the propounding and answering of numerous interrogatories and the taking of several depositions. Plaintiffs' counsel have also analyzed various reports prepared by, and testimony given before, the Securities and Exchange Commission (SEC), the Subcommittee on Economy in Government of the Joint Economic Committee, the Congress of the United States and the Secretary of the Air Force. In addition, two books, one entitled "The C–5A Scandal" and the other, "High Priests of Waste," were analyzed and abstracted, as were reports concerning the market prices of Lockheed stock and the stocks of competitive aerospace companies during the relevant periods.

Plaintiffs' counsel feel that the discovery revealed convincing evidence in support of their position on the class action claims. They have reached the opposite conclusion with respect to the derivative claims asserted in the *Stull* action.

Defendants have steadfastly denied any wrongdoing at all and it has become increasingly clear that further preparation for trial would be a massive task involving additional discovery of hundreds of thousands of documents. The records which would ultimately be placed before the Court would not only be voluminous, but would be so complex and difficult to understand that they would surely be subject to different interpretations by various expert witnesses. As the SEC stated in its report:

> "[I]t must be recognized that the amount of documentation related to this project (C–5A) is tremendous, much of it unintelligible to a nonexpert and much of it extremely detailed." *Report of Investigation in Re Lockheed Aircraft Corporation,* Vol. I, HO–423 at 3 (SEC Report).

Similarly, Judge Bryan had observed:

> "This case is a complicated one and class action plaintiffs in suits of this nature are faced with substantial difficulties." *Stull v. Baker,* [1973] CCH Fed.Sec.L.Rep. ¶ 94,227 (S.D.N.Y. July 27, 1973).

Therefore, although counsel may feel they have a strong case, as in all actions of the size and complexity of this one (at pre-trial conferences it was estimated that the trial of the consolidated actions could conceivably take a year), the result could not be predicted with any reasonable degree of certainty.

*The Settlement Agreement*

Serious settlement negotiations commenced in mid-1974 and culminated a year later when the "Stipulation and Agreement of Settlement of Shareholder Class Action Claims and Dismissal of Derivative Action Claims" dated July 24, 1975 (the Settlement Agreement) was presented to the Court.

For the purposes of the proposed settlement, the *Stull* Class was expanded to include all persons who (1) purchased shares of Lockheed common stock between September 30, 1965 and November 30, 1968, inclusive, and (2) beneficially owned such shares on November 30, 1968 (the Settlement Class).[1]

The November 30, 1968 date was selected as the terminal date for the Settlement Class because, while the parties could not agree as to when public disclosure had first occurred with respect to losses and cost overruns in the production of the C–5A, they did agree that such public disclosure had occurred by November 30, 1968. September 30, 1965, the date the award to Lockheed of the C–5A contract was publicly announced, is the commencement date for the Settlement Class as it is for the *Stull* Class.[2]

The Settlement Agreement provides that Lockheed and its insurers and indemnitors will deposit $2,000,000 with an escrow agent (the Settlement Fund). The Settlement Fund will initially be disbursed to pay the costs of printing, publishing and mailing the class notice, attorneys' fees and disbursements to the extent awarded by the Court, certain expenses of the administration of the settlement (subject to court approval), and the fees and expenses of the escrow agent responsible for distributing the Settlement Fund. After these disbursements, the balance of the Settlement Fund, together with any interest or other income thereon, will be distributed, on a pro rata basis according to the number of eligible shares of Lockheed common stock purchased by the claimant, to those members of the Settlement Class (a) who have not requested to be excluded therefrom, (b) who filed a properly executed and completed Proof of Claim and Release, and (c) whose Proof of Claim and Release is not disallowed by the Court.[3]

The Settlement Agreement does not provide for any payment to Lockheed in connection with the termination of the derivative claims which were alleged on behalf of Lockheed in the *Stull* action.

Finally, if the settlement is approved, provision is made for dismissal of all claims, on the merits, with prejudice, with appropriate releases being delivered to defendants.

*Hearing on the Proposed Settlement*

In accordance with the notices mailed to all potential class members, the hearing on the proposed compromise was held on December 5, 1975. No testimony was presented, but both before, at, and after the hearing, affidavits, exhibits and memoranda were submitted.

Attorneys for a number of the parties made statements in favor of the pro-

---

1. Creating provisional classes for settlement purposes, although not a common practice, is not unheard of, nor, where appropriate, frowned upon. *Girsh v. Jepson,* 521 F.2d 153, 155 n.3 (3d Cir. 1975); *Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832 (3d Cir. 1973).

2. Persons who requested to be excluded from the *Stull* Class in 1974, when the notice of class action determination was mailed to them, will be considered to have requested to be excluded from the Settlement Class to the extent that their membership therein derives from purchasing Lockheed common shares during the period from September 30, 1965 to and including January 24, 1966, the critical dates as originally formulated by Judge Bryan.

3. The Settlement Agreement further provides that no claimant shall receive in excess of $3.00 per eligible share. If any monies remain in the Settlement Fund after payment has been made on all valid claims, such sum will be returned to Lockheed.

Counsel have advised the Court that this provision has been rendered academic by the number of proofs of claim already approved. Approved claims represent in excess of 1,000,-000 shares and accordingly the entire Settlement Fund would be absorbed without exceeding the $3.00 per share limit.

posed settlement and answered several questions propounded by the Court. No one at the hearing expressed any opposition to either the settlement or the fee application.

## STANDARDS FOR APPROVAL OF SETTLEMENT

*The Caselaw*

### a) generally

■ The courts, as well as the law, favor the compromise of disputed claims. *Williams v. First National Bank*, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625, 631 (1910); *Weight Watchers of Philadelphia Inc. v. Weight Watchers International, Inc.*, 455 F.2d 770, 773 (2d Cir. 1972); *Florida Trailer and Equipment Company v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960); *Siegel v. Realty Equities Corp.*, [1973] CCH Fed.Sec.L.Rep. ¶ 94,-102 at 94,445 (S.D.N.Y. July 30, 1973). Therefore, although the Court has an obligation to protect the class members from a collusive or improvident settlement, and the approval of a proposed settlement of a class action or derivative suit is a matter of discretion for the trial court, *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co., Inc.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *Connecticut Ry. & Lighting Co. v. New York, N. H. & H. R. Co.*, 190 F.2d 305, 308 (2d Cir. 1951) and cases cited therein, I am not insensible of the maxim that settlements should "not * * * be lightly rejected." Haudek, The Settlement and Dismissal of Stockholder's Actions, 23 Sw.L.Rev. 765, 793, 792–801 (1969); *Josephson v. Campbell*, [1967–69] CCH Fed.Sec.L.Rep. ¶ 92,347, at 97,655 (S.D.N.Y.1969).

■ It is not necessary, nor expected, that plaintiffs obtain through settlement all that would have been realized through a victorious trial. It is the in-

trinsic nature of a settlement that no party will completely fulfill its absolute goals, *Fox v. Glickman Corp.*, 253 F.Supp. 1005, 1012 (S.D.N.Y.1966), but rather that, after considering all the relevant circumstances, it is resolved by all involved that it is in their best interests to terminate the litigation on the basis of a fair and reasonable compromise. *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y.1972); *Rosenfeld v. Black*, 336 F.Supp. 84, 87 (S.D.N.Y.1972); *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y.1971); *State of West Virginia v. Chas. Pfizer & Co., supra*, at 740–41.

### b) recommendation of counsel

■ In considering the merits of a settlement, the court should consider the recommendation of counsel. *State of West Virginia v. Chas. Pfizer & Co., supra*, at 741; *Fielding v. Allen*, 99 F.Supp. 137, 144 (S.D.N.Y.1951). However, the weight to be given that recommendation, and the accompanying presumption of reasonableness which attaches to a proposed settlement, will depend upon the caliber of counsel and their experience in matters similar to that which is before the court, as well as proof that the settlement was the product of arm's-length bargaining entered into after there had been sufficient discovery to enable counsel to act intelligently. See *Helfand v. New America Fund, Inc.*, 64 F.R.D. 86, 90 (E.D.Pa.1974), *vacated on other grounds sub nom. Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975); *Siegel v. Realty Equities Corp., supra*, at 94,445–46; *Trainor v. Bernor*, 334 F.Supp. 1143, 1149 (S.D.N.Y.1971); *Percodani v. Riker-Maxson Corp.*, 50 F.R.D. 473, 477–78 (S.D.N.Y.1970); *Fielding v. Allen, supra*, at 144.

■ All the firms involved in this litigation are highly experienced and well respected, particularly in the field of securities law litigation. The Stull and Milberg firms are two of this area's, if not the nation's, most active and successful law firms specializing in securities litigation. The Stull firm is presently

engaged in stockholders' actions in federal courts in Georgia, Florida, Maryland and Massachusetts, as well as in several cases pending in the Southern and Eastern Districts of New York. The Milberg firm is presently engaged in a substantial number of stockholders' actions in California, Texas, Massachusetts, Illinois and New York. Moreover, defense counsel are eminent, experienced members of the bar and would constitute formidable adversaries for any attorney who would opt for trial.

Unlike the situation in cases such as *Percodani v. Riker-Maxson Corp., supra,* at 477–78, settlement discussions were not even seriously initiated until years of arduous discovery had been completed, and counsel were truly in a position to analyze objectively the strength of plaintiffs' case on the merits, and to balance that strength against the amount offered in settlement and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *Cf. Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1, 9–10 (1968). In addition, there is not even the slightest hint that this settlement was the result of anything but zealously advocated, arm's-length negotiation.

In light of these circumstances, the fact that counsel have executed and unanimously recommended approval of the Settlement Agreement is entitled to great weight in my consideration of this settlement.

#### c) objections from interested parties

■ Another factor considered important is the number and relative interests of the objectants. *Siegel v. Realty Equities Corp., supra* at 94,445–46; *Trainor v.*

*Bernor, supra* at 1149; *Josephson v. Campbell, supra* at 97,658; *Fox v. Glickman Corp., supra* at 1013. In connection with the settlement of this litigation, all potential class members were apprised, in detail, of the terms of settlement now before the Court. Notice was also given of the size of the fee application, which will be considered below.

Despite more than 79,000 notices which were sent to shareholders of record and the more than 15,000 notices supplied to brokers who are, or were, record owners of Lockheed common stock actually owned by customers to whom the brokers forwarded the notices, there has not been, as of the date of filing this memorandum, a single objection either to the settlement or to the proposed attorneys' fees. Such objection could have been noted simply by sending a letter to the Court, or counsel, or, as noted earlier, by personal participation at the hearing on December 5, 1975.

#### d) likelihood of success
##### i—scope of review

■ Finally, I am acutely sensitive to the axiom that, since "the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation," *Newman v. Stein, supra* at 692, this Court's function "[i]n determining whether to approve the compromise or not, the Court [is] not [to] try out the disputed issues." *Schleiff v. Chesapeake & Ohio Ry. Co.,* 43 F.R.D. 175, 178–79 (S.D.N.Y.1967) and cases cited therein. See also *Newman v. Stein,* supra at 691–93; *State of West Virginia v. Chas. Pfizer & Co., supra* at 741, and cases cited therein. However, while the Court should not turn a settlement hearing into a plenary trial on the merits,[4] in order to determine whether

---

**4.** The Court should always keep in mind that,

"If the presence of issues of fact and questions of law make [recovery] problematical, the determination of what amount of money constitutes a fair settlement is not a matter of mathematical science. On the one hand perhaps plaintiff's counsel have obtained more for the class than a jury would award; on the other hand, it may be less. The court

is in no position to substitute its judgment for that of honest and competent attorneys, who, after exhaustive discovery, have made a determination that the settlement represents a fair and realistic appraisal of their clients' chances of ultimate success."
*Siegel v. Realty Equities Corp., supra* at 94,-446; see *Glicken v. Bradford,* 35 F.R.D. 144, 151 (S.D.N.Y.1964).

the settlement bestows benefits which are equivalent to the claims being surrendered, the Court must form

> "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" [and must make] "an educated estimate of the complexity, expense, and likely duration of such litigation, * * * and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, supra* at 424; *Newman v. Stein, supra* at 691–92; *Neuwirth v. Allen,* 338 F.2d 2, 3 (2d Cir. 1964); *State of West Virginia v. Chas. Pfizer & Co., supra* at 740–41.

A careful study of the respective theories of the parties, as set forth in the material placed before the Court, leads to the conclusion that the chances of plaintiffs' succeeding on the liability portion of the class action claims are slight. The likelihood of their proving substantial damages is even smaller and recovery on the derivative claims seems hopeless. The basic reasons for this conclusion will be outlined below.

### ii—class action claims

In addition to contesting plaintiffs' theories of liability, defendants vigorously attack the level of damages sought in the complaint. Defendants point to the relatively small, if existent, market impact of the November 1968 disclosures of Lockheed's losses on the C–5A contract. Defendants also rely heavily upon the similarity of performance between Lockheed stock and the stock of its major aerospace competitors during the applicable periods. It is argued that this similarity leads to the "conclusion that the public controversy over the C–5A project in late 1968 and early 1969 did not result in a market erosion of investor confidence with respect to Lockheed's common stock."

This is a very convincing argument when considered in light of the fact that on November 30, 1968, the date plaintiffs contend disclosure took place, Lockheed's common shares were selling at about $50. This is compared to the high of $74 and the low of $48 per share reached the previous year. The stock dropped to about $47 by the end of December; recovered to about $49 in late January; and thereafter, together with other aerospace equities which were experiencing comparable fluctuations, declined in price.

Plaintiffs' additional argument that Lockheed insiders profited from the alleged misrepresentations and nondisclosures is misplaced in this class action claim against the corporation; it would seem more appropriate to the derivative claim against the insiders discussed hereinafter. Moreover, the allegations of insider profits run counter to the findings of independent investigations conducted by the Air Force, the SEC and Congress. In a summary of the SEC Report, that agency's staff determined:

> "In analyzing the relevant stock transactions of all sixteen of these individuals from the standpoint of potential 10b–5 violations, several general observations should be made. In the first place, their sales in the majority of cases during this period were concentrated within the initial 18 months of the program (i. e., up to March, 1967), the one significant exception being the sales of Mr. Hibbard. The importance of this point is obviously that the earlier in the life of the C–5A that these sales took place, the less likely it is that they were influenced by the problems of the project (which grew steadily worse during the years 1967, 1968 and 1969). It is also significant to note that in the majority of cases these sales were followed by purchases. In fact, these men for the most part ended this period holding about the same number of shares of Lockheed stock as they held at the beginning. Mr. Hibbard, Mr. Gross and Mr. Janssen, who did not, still retain sizeable holdings to the present date: 20,-

612 shares, 52,035 shares, and 2,991 shares respectively." (Footnotes omitted). SEC Summary Memorandum at p. v.

Similarly, Irving M. Pollack, then Director of the SEC Division of Trading and Markets, who transmitted the SEC Report to the Commission, testified before Congress on July 10, 1970 as follows:

"[T]here were no actionable violations in the insider trading because, as the report indicates, we did not find a correlation between the selling and any material significant insider information which the people had at that time. And so based upon that evaluation of the facts which we had developed, we did not feel that there were any actionable violations in that area." Hearings Before the Subcommittee on Economy in Government of the Joint Economic Committee, Congress of the United States, July 10, 1970, at p. 281.

While this Court might have reached a different factual conclusion, plaintiffs' counsel would not have been serving their clients' interest if they chose to ignore these determinations.

At the heart of the *Stull* action, particularly in light of the termination date of the *Stull* Class—only four months after the C–5A contract had been announced—is the claim that Lockheed effected a "buy-in" of the contract when it concededly undercut its own original estimate by ten per cent and failed to disclose this fact in violation of the federal securities laws.

Defendants have contended, as did Lockheed during the course of the various public investigations, that there was no underbidding in the contract at the time it was awarded; that Lockheed in good faith anticipated that it would make a reasonable profit on the contract and that the profit margin provided for in the initial formulation was above the average booked corporate profit experienced by Lockheed.

At page 18 of the so-called Whittaker Report made to the Secretary of the Air Force, it was stated:

"There is no clear evidence of a 'buy-in', in that Lockheed undoubtedly had a basis and rationale on which the contract would cover their costs as projected."

Similarly, the SEC's Report stated:

"Questions have been raised as to whether Lockheed 'bought-in' on the contract. There are various definitions of a 'buy-in', but in the sense of projecting a loss on the contract, absent some 'get well' arrangements, neither the GAO nor the Air Force was able to find evidence of this. Since initial pricing is based on only a general aircraft configuration, without detailed design, it is by nature inexact, broadening the area of plausible estimates and increasing the difficulty of proving a 'buy-in'." Volume I at page 11.

Plaintiffs' complaints of course also include claims of wrongful acts not specifically treated by the previous investigations. However, defendants assert various explanations and defenses to these claims as well, and a trial would undoubtedly reduce itself to a series of hotly contested issues of fact subject to conflicting testimony by numerous experts. The resolution of these issues could not be prophesied with any assurance and patently there exists in this case a substantial question as to whether a trial would be in the best interests of the class.

■ Measured against all the above, I find that the $2,000,000 offered in settlement of the class action claims is fair, reasonable and even generous and that the best interests of the Settlement Class would be served if the Settlement Agreement were approved.

### iii—derivative claims

As previously noted, the Settlement Agreement does not provide for a payment to Lockheed in connection with the

dismissal of the derivative claims asserted in the *Stull* action.

The Stull firm has reported to the Court that the decision to recommend a dismissal of the derivative claims without consideration is based upon facts adduced during discovery, which revealed that the derivative claims "are of doubtful merit," that a trial of the issues would be expensive and time-consuming, and that it is unlikely that plaintiff could prevail.

At the May 5, 1975 meeting of the Board of Directors of Lockheed, the Board by resolution determined that

"it is in the best interests of the Corporation and of its shareholders that said derivative claims not be maintained; that they be dismissed with prejudice without receipt by the Corporation of any consideration therefor * * *."

By virtue of the passage of time, a majority of the members of Lockheed's Board on May 5, 1975 were persons who were not directors at the time the *Stull* action was commenced, are not defendants in that action, and had no involvement in the acts and practices complained of in said action. Their determination that dismissal of the derivative action is in the best interests of Lockheed and its shareholders is, at least on its face, an unbiased determination and entitled to considerable weight.

The derivative claims asserted in the *Stull* action were based upon three transactions involving Lockheed securities purportedly violating Rule 10b–5. The transactions were: 1) the issuance by Lockheed of certain purchase options for its own stock; 2) the issuance by Lockheed of a public debenture bond issue in March 1967; and 3) the exchange by Lockheed of 100,000 shares of its own stock for all of the shares of Aviquipo, Inc., in December 1969.

From the outset, defendants asserted that the above transactions were profitable for Lockheed and thus could not give rise to liability in a derivative suit brought under Rule 10b–5. Defendants further point out that, to any extent that the market price of Lockheed stock was artificially inflated by non-disclosure of unfavorable information relating to the C–5A contract, Lockheed profited all the more.

More specifically, with respect to the purchase options, it is now undisputed that the particular options complained of, while issued during the class period, went unexercised and ultimately expired. The bond issue of March 1967 enabled Lockheed to obtain monies without which, it is represented, Lockheed might not have been able to survive prior to the much-publicized Government rescue operation. Finally, the exchange of stock with Aviquipo, Inc. occurred in December 1969, over one full year after public disclosure of Lockheed's difficulties with respect to the C–5A program. From all the information now before the Court, this seems to have been a meritless, "makeweight" claim.

Having had ample discovery, plaintiff in the *Stull* action apparently has realized that, although there may have been securities law violations by Lockheed *vis-a-vis* investors in Lockheed stock who were the victims of concealment and non-disclosure, the same activities did not produce a cause of action on behalf of Lockheed when it, more than anyone, would have benefited from artificially inflated prices of its stock.

Before passing upon the request to dismiss the derivative claims, however, I believe it appropriate to comment upon two procedural devices employed by the Stull firm which, subsequent to the filing of the *Stull* complaint, have become the subject of considerable judicial debate.

First, both class action and derivative claims are asserted in the *Stull* action. As a number of federal judges, including myself, have recently commented, it is difficult to understand how an attorney can properly represent the interests of a corporation and its present shareholders in a derivative action brought on their behalf, and, at one

and the same time, properly represent its present and/or former shareholders in a class action against the corporation, without compromising his independence of professional judgment and loyalty to these two groups of clients with potentially conflicting interests. See *Caan v. Kane-Miller Corp.,* 71 Civ. 878 (S.D.N.Y. December 18, 1974); *Ruggiero v. American Bioculture, Inc.,* 56 F.R.D. 93 (S.D.N.Y.1972); *Wood v. Rex-Noreco, Inc.,* 61 F.R.D. 669, 674 (S.D.N.Y.1973); *Hawk Industries, Inc. v. Bausch & Lomb,* 59 F.R.D. 619, 624 (S.D.N.Y.1973). Whether this conflict is actual or only apparent, present or only potential, judges must consider even apparent or potential conflicts of interest between a plaintiff and the class he seeks to represent. *Lynch v. Sperry Rand Corp.,* 62 F.R.D. 78, 84 (S.D.N.Y.1973); *duPont v. Perot,* 59 F.R.D. 404, 411 (S.D.N.Y.1973); *Free World Foreign Cars, Inc. v. Alfa Romeo,* 55 F.R.D. 26, 29 (S.D.N.Y.1972).

Secondly, plaintiff Richard J. Stull is the uncle and law partner of his attorney Robert A. Stull. With increasing frequency, trial courts have found that, when the class plaintiff is so closely allied with the class' attorney that he or she might have an interest in the legal fees that the attorney may ultimately seek, there is at least a potential conflict of interest. *Stull v. Pool,* 63 F.R.D. 702, 704 (S.D.N.Y.1974); *In re Goldchip Funding Co.,* 61 F.R.D. 592, 594–95 (M.D. Pa.1974); *Graybeal v. American Savings & Loan Association,* 59 F.R.D. 7, 13–14 (D.D.C.1973); *Cotchett v. Avis Rent-A-Car System, Inc.,* 56 F.R.D. 549 (S.D.N.Y.1972); *Kriger v. European Health Spa, Inc.,* 56 F.R.D. 104, 105–06 (E.D.Wis. 1972); *Shields v. Valley Nat'l Bank,* 56 F.R.D. 448, 449–50 (D.Ariz.1971). In fairness, however, it should be noted that this view, at least in certain circumstances, is not without its detractors, see, e. g., *Sweet v. Birmingham,* 65 F.R.D. 551, 553 (S.D.N.Y.1975); *Umbriac v. American Snacks, Inc.,* [1974–75] 388 F.Supp. 265 CCH Fed.Sec.L.Rep. ¶ 94,963 (E.D.Pa. January 27, 1975); *Lamb v. United Security Life Co.,* 59 F.R.D. 25, 30 (S.D.Iowa 1972).

I cannot say that plaintiffs' counsel were wrong in their assessment that the derivative claims could never survive a trial on the merits and, accordingly, I approve the dismissal of the derivative claims, see *Glechen v. Bradford,* 35 F.R.D. 144, 151 (S.D.N.Y.1964). However, I cannot help wondering whether this dismissal would have been as willingly entered into if there were not a substantial settlement fund in the class action upon which the presently pending fee application could rest.

It is obviously preferable that the Court not be placed in the difficult position of having to determine, without the assistance of highly motivated advocates in adversary roles, whether the interests of the corporation are being sacrificed in favor of the class, or *vice-versa.*

## II.

As noted above, in addition to the proposed settlement, also before the Court is a joint application by the Stull and Milberg firms and the firm of accountants they retained, seeking an award of attorneys' fees of $300,000 and disbursements of $9,616.43 for services rendered in connection with the consolidated actions.

## BACKGROUND

[14, 15] Unlike the British system, the usual rule in American jurisprudence is that, in the absence of statutory authority or an authorizing contract, federal courts do not award counsel fees. *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 717–20, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475, 478 (1967); *Grace v. Ludwig,* 484 F.2d 1262, 1267 (2d Cir. 1973), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1610, 40 L.Ed.2d 110 (1974); *1507 Corporation v. Henderson,* 447 F.2d 540 (7th Cir. 1971); *Tartell v. Chelsea National Bank,* 351 F.Supp. 1071 (S.D.N.Y.), *aff'd,* 470 F.2d 994 (2d Cir. 1972). Nevertheless, as "part of the original authority of the chancellor to do equity in a particu-

lar situation," *Sprague v. Ticonic National Bank*, 307 U.S. 161, 166, 59 S.Ct. 777, 780, 83 L.Ed. 1184, 1187 (1939); *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702, 707 (1973); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391–92, 90 S.Ct. 616, 625, 24 L.Ed.2d 593, 605–606 (1970); see *Grace v. Ludwig, supra* at 1267, the Supreme Court has recognized two situations where federal courts may shift the expenses of litigation, including attorneys' fees. I recently outlined these exceptions as follows:

"1) where the obdurate behavior of a party has reflected wilful disobedience of a court order, or when the losing party has acted in bad faith, wantonly or vexatiously, the court may assess attorney's fees as a punitive measure. * * *

"2) when by their own efforts a claimant and his attorneys have created or preserved a common fund or substantial benefit, not necessarily pecuniary, for the members of a particular class, attorney's fees are deducted from the total recovery in order to distribute fairly the burdens of a successful litigation among those who will reap its rewards.

\* \* \* \* \* \*

"The equitable basis of this [second] exception is the prevention of unjust enrichment—that is, that the plaintiff, at his own expense, has conferred a benefit upon the class for which justice demands he be recompensed."[5]

*Korn v. Franchard Corp.*, 67 Civ. 3445, Memorandum and Order at 5–6 (S.D. N.Y. July 25, 1975).

## ANALYSIS

There is no contention that defendants have in any way been guilty of obdurate conduct during the course of this litigation. However, the $2,000,000 Settlement Fund furnishes the Court with an ample base from which an award of attorneys' fees can be granted under the common fund or substantial benefit theory.

■ Measuring the facts of this case against the criteria outlined in cases such as *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974), and *Alpine Pharmacy v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973), a fee of $300,000 bears a reasonable relationship to the $2,000,000 Settlement Fund.

The amount requested represents fifteen per cent of the Settlement Fund. Traditionally, courts in this district and elsewhere have awarded fees ranging from twenty to forty per cent of the recovery in situations not unlike the one before this Court. See *Rosenfeld v. Black*, 56 F.R.D. 604, 605–06 (S.D.N.Y. 1972) and cases cited therein; *Epstein v. Weiss* [1970–71] CCH Fed.Sec.L.Rep. ¶ 92,938, at 90,476 (E.D.La.1970) and cases cited therein. While this percentage may not be appropriate in every case, for the reasons outlined below, I find that it is reasonable in this case.

The cases are legion that, where, as here, counsel undertake the risks and burdens of prosecuting complicated derivative or class actions on a contingency basis, generous fees should be awarded upon the successful conclusion of the litigation. Fees approaching, and exceeding, three times the normal hourly rates paid to attorneys retained on a noncontingent basis are not uncommon. See, e. g., *Gissen v. Colorado Interstate Corp.*, Civil Action No. 4645 at p. 13 (D.C.Del. March 6, 1975) ("the amounts determined on the basis of reasonable hourly rate[s]

---

**5.** At one point, the courts began carving out another exception to the traditional American rule against awarding attorneys' fees. This exception, which is, in part, relied upon by plaintiffs' counsel, ran in favor of plaintiffs, denominated "private attorneys general," who had rendered a substantial service to the public by effectuating a particular congressional policy. The Supreme Court, however, in an extensive review of the background and theory behind permitting a litigant to recover attorneys' fees, has declared that this practice is impermissible. *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

should be doubled because of the contingency and quality factors"); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 382 F.Supp. 999 (E.D.Pa.1974) (in awarding attorneys' fees in excess of $1,000,-000, the Court doubled the normal hourly rates charged by plaintiffs' counsel); *Arenson v. Board of Trade of the City of Chicago,* 372 F.Supp. 1349 (N.D.Ill.1974) (court awarded four times the petitioning attorneys' normal hourly rate); *Quirke v. Chessie Corp.,* 368 F.Supp. 558 (S.D.N.Y.1974) (Judge Gurfein awarded a fee equalling $220 per hour); *Donson Stores, Inc. v. American Bakeries Co.,* [1973–74] 60 F.R.D. 417 CCH Trade Cas. ¶ 74,691 at 95,066 (S.D.N.Y.1973) (attorneys' fee approved in excess of $200 per hour for all services rendered, whether by senior partners, junior partners, senior associates or junior associates"); *Goldstein v. Alodex Corp.,* 409 F.Supp. 1201, Civ. Action No. 71–1857 (allowed fee amounting to over $500 per hour and approximately twenty per cent of a $4,750,000 settlement fund). Such increased compensation recognizes the possibility that counsels' efforts may go for naught if they are not successful in the litigation. See *Korn v. Franchard Corp., supra* (despite hundreds of hours invested by competent counsel, no fee was awarded).

The time charts before the Court indicate that approximately 3300 hours of attorneys' time [6] and 750 hours of accountants' time, exclusive of the time spent in preparing this fee application or yet to be spent in distributing the settlement funds, have been expended in filing and prosecuting the consolidated actions and negotiating the settlement. This computes to approximately $75 per hour, considerably lower than the range typically awarded to counsel who have produced a benefit as substantial as that obtained in the instant case.

Although the "measurement of proper fees is not always the time spent," *Rosenfeld v. Black, supra* at 606, when considered in conjunction with the complexity of this litigation, the high costs of maintaining a law office in these inflationary times, the quality of the work performed, the benefit secured for the class and the professional standing of counsel, it is clear that the attorneys in this case should be awarded the fee requested.[7]

A fee of $300,000, plus disbursements of $9,616.43, is jointly awarded to the firms of Stull, Stull & Brody and Milberg & Weiss.

An Order and Judgment dismissing the complaints is being filed simultaneously with this Memorandum and Order.

---

6. This figure does not reflect, nor have I considered, the approximately one hundred hours spent exclusively on the derivative claims which are being discontinued without consideration. See *Baily v. Meister Braun, Inc.,* 378 F.Supp. 883, CCH Fed.Sec.L.Rep. ¶ 94,837 (N.D.Ill. June 5, 1974).

7. Although plaintiffs' counsel did have the benefit of extensive government investigations, a factor usually considered to reduce the size of a requested fee, *City of Detroit v. Grinnell,* 495 F.2d 448 (2d Cir. 1974), the size of the fee requested is small enough to reflect this fact without requiring further reduction.