**Mariann S. MASHBURN, et al., Plaintiffs,**

v.

**NATIONAL HEALTHCARE, INC., et al., Defendants.**

**Civ. A. No. 87–D–0070–S.**

United States District Court, M.D. Alabama, S.D.

March 8, 1988.

---

Rufus Smith and Edward Price, Jr., Farmer, Price & Smith, Dothan, Ala., Edward L. Hardin, Jr., Hardin & Hollis, J. Michael Rediker, David J. Guin, David R.

Donaldson, Ritchie & Rediker, Birmingham, Ala., for plaintiffs.

Kenneth L. Millwood, John L. Latham, Smith, Gambrell & Russell, Atlanta, Ga., Alan C. Livingston, Lee & McInish, Dothan, Ala., for Nat. Healthcare, Inc., William H. Cassels, Thomas C. Shepard, Charles E. Baxter, James R. Stephenson and John S. Schwartz.

Thad G. Long, J. Barry Jones, Bradley, Arant, Rose & White, Birmingham, Ala., for L. Stanton Tuttle.

Henry B. Gutman, Charles E. Bachman, John S. Beckerman, O'Sullivan Graev & Karabell, New York City, Robert W. Bradford, Jr., Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for Robert F. Higgins, Howard C. Landis, Anders K. Brag, Regional Financial Enterprises, L.P., Regional Financial Enterprises II, L.P., Charles River Partnership V, Hambro Intern. Venture Fund, and Hambro Intern. Venture Fund Offshore.

Robert M. Brinson, Brinson, Askew & Berry, Rome, Ga., for Tom E. Greene, III, Med Capital Investors, Greene Family Trust and Healthtech Investors II.

Dan F. Laney, III, C.B. Rogers, Richard H. Sinkfield, Rogers & Hardin, Atlanta, Ga., for Stephen L. Phelps.

George G. Lynn, A. Inge Selden, III, Luther M. Dorr, Jr., Maynard, Cooper, Frierson & Gale, Birmingham, Ala., for Joseph D. Bohr, Jr., Dale R. Mulder, Jay Russell.

Frank M. Wilson, Beasley, Wilson, Traeger, Allen & Mendelsohn, John M. Pappanastos, Susan Shirock DePaola, Pappanastos & Samford, Montgomery, Ala., for Drexel Burnham Lambert Inc., Bear, Stearns & Co. Inc., Robertson, Colman & Stephens.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for Mont–Med Associates.

Thomas S. Lawson, Jr., J. Lister Hubbard, James N. Walter, Jr., Capell, Howard, Knabe & Cobbs, Montgomery, Ala., for Curtis L. Adams, Scott W. Bauman, Robert E. Johnstone and Charles G. Taylor.

James D. Farmer, Farmer & Farmer, Dothan, Ala., for Holders of Subordinated Debentures.

Paul W. Brock, W. Ramsey McKinney, Rayford L. Etherton, Jr., Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for Wood, Lucksinger and Epstein.

Thomas W. Thagard, Jr., Michael L. Edwards, Balch & Bingham, Birmingham, Ala., Eugene R. Erbstoesfer, Associate General Counsel, Arthur Young and Co., New York City, for Arthur Young & Company.

J. Vernon Patrick, Patrick & Lacy, P.C., Birmingham, Ala., for National Healthcare, Inc.

## MEMORANDUM OPINION

DUBINA, District Judge.

This is a complex securities case. On February 29, 1988, the Court conducted a hearing in this cause with respect to (a) whether the settlement stipulation filed on December 30, 1987, by and between plaintiffs, by counsel, and defendants, by their counsel, should or should not be approved; [1] (b) whether the settlement of the claims asserted or which could have been asserted in this cause by the plaintiffs and members of the plaintiff class against the defendants, based on the facts alleged in the plaintiffs' complaint, as amended, in accordance with the terms and conditions of said settlement stipulation, should or should not be approved and found to be fair, reasonable and adequate; and (c) whether all claims asserted in this action by the plaintiffs, for themselves and members of the plaintiff class, against the defendants, or which could have been asserted in this action, based on the facts alleged in the plaintiffs' complaint, as amended, should be dismissed with prejudice.

Prior to the final hearing in this cause, the Court reviewed numerous affidavits filed by plaintiffs' counsel concerning the notice given to members of the plaintiff class by publication and by mail; affidavits submitted by Cory G. Jackson and Ural Tutak, who are named plaintiffs in this cause, wherein they state that they agree with the proposed settlement; the Form S–1 Registration Statement under the Securities Act of 1933, which was filed by National Healthcare, Inc. with the Securities and Exchange Commission in Washington, D.C., on February 26, 1988; objections to the proposed settlement submitted by Mr. Norman Gomberg, Great Neck, New York; Dr. Robert M. Cosby, Birmingham, Alabama,[2] Professor Stephen P. Hill of Urbana, Illinois; and the "Maddox Class" represented by Sam Cherry, Esq., of Dothan, Alabama. Additionally, the Court has read the plaintiffs' memorandum of points and authorities in support of the proposed settlement filed herein on February 26, 1988; the objection to class action certification and settlement filed herein by the "Maddox Class" on February 16, 1988; and a memorandum in response to objection filed by the self-appointed "Maddox Class" filed herein on February 24, 1988, by plaintiffs' counsel. The Court also heard the testimony of various witnesses at the final settlement hearing. Each of these witnesses testified that it was in the best interests of all of the plaintiff class members for this Court to approve the settlement.

## I. STATEMENT OF FACTS

National Healthcare, Inc. (hereinafter "NHC") is a publicly-held rural health care management corporation. The company was begun in late 1981 by three of the named defendants: Steven L. Phelps (also the former Chairman, CEO, and President), Joseph D. Bohr, Jr. (a former Director and Chief Financial Officer), and William H. Cassels (a division Vice President). In its early years, NHC remained a relatively small company. As of December 31, 1984,

---

**1.** The settlement contemplates, *inter alia,* the payment by defendants other than National Healthcare, Inc., of $9,925,000 in cash and the issuance by the company to the class members of 300,000 shares of 25% Participating Convertible Preferred Stock.

**2.** Dr. Cosby objects only to the amount of attorneys' fees requested in the settlement proposal. In his letter written to the Clerk of this Court, he states that he otherwise approves of the plan and will participate in the settlement fund.

the company had acquired nine hospitals. Each of those hospitals averaged fewer than fifty beds. By November 1985, the company had acquired several additional hospitals bringing its total to fifteen. At that time, NHC's plan was to continue purchasing small hospitals in rural communities and to then use what the company's leaders believed to be unique management techniques to turn such poorly-managed rural hospitals around in a very short time and into profitable facilities.

To finance the company's growth, NHC "went public" in November 1985 by issuing and selling to the public through a "firm commitment" underwriting 2,000,000 shares of its common stock. Through the exercise of an over-allotment option, the underwriters acquired from certain venture capitalist/selling warrantholders and sold an additional 300,000 shares of such stock. The initial offering price of such 2,300,000 shares of stock was $9.00 per share. In addition to the stock offering, NHC issued subordinated debentures having a principal amount of $30,000,000 and bearing interest at the rate of 14½% per annum.

NHC announced earnings for the first quarter of 1986 (for the quarter ended September 30, 1985) showing that the company had earned $.05 per share for the quarter, and by the end of December 1985, the stock price had risen to approximately $13.00 per share. On February 4, 1986, the company announced increased earnings for the second quarter of fiscal 1986 (for the quarter ended December 31, 1986) of $.09 per share, and the stock then rose to approximately $15.00 per share. From December 31, 1985, until April 1986, NHC acquired or signed letters of intent to purchase nine additional hospitals.

In April 1986, NHC followed its initial public offering with a second offering of 2,000,000 shares of common stock, this time at a price of $13.50 per share. Again, the initial allotment was sold and the underwriters exercised their over-allotment option to purchase from the selling warrantholders and sell an additional 300,000 shares. No new debentures were offered in this second public offering. Thus, a total of 4,600,000 shares were issued and sold in the two public offerings.

In each of the two public offerings, the defendant law firm of Wood, Lucksinger & Epstein served as securities counsel to NHC, and the defendant public accounting firm of Arthur Young & Company prepared the financial statements contained in the registration statements and prospectuses (with the exception of certain financial statements for individual hospitals prepared by other accounting firms before NHC's acquisition of such hospitals). Drexel Burnham Lambert, Inc.; Bear Stearns & Company, Inc.; and Robertson Coleman & Stephens served as lead underwriters of each of the two stock offerings and Drexel Burnham and Bear Stearns co-underwrote the November 1985 offering of debentures. Another 70–plus underwriters participated in the "underwriting syndicate" in each of the two public stock offerings. All of the remaining defendants are either officers, directors, selling warrantholders, or control persons (or affiliates thereof of NHC).

In mid–1986, NHC announced third-quarter earnings (for the period ending March 31, 1986) of $.22 per share. After that announcement, the company stock quickly rose to approximately $17.00 per share, but had declined to around $14.00 per share by the late summer of 1986. On September 18, 1986, NHC announced earnings for the fourth-quarter of fiscal 1986 of only $.02 per share. For the year, NHC announced earnings of $.38 per share, much less than the $.53 per share figure that had been publicly forecasted. Accordingly, the day of that announcement, the price of NHC common stock declined by approximately 42% to $7.50 per share. The price of the stock continued to fall and by December 31, 1986, it was trading at approximately $4.00 per share.

On January 9, 1987, NHC announced that it expected a $7,000,000 write-off for the second quarter of fiscal 1987 (the quarter ending December 31, 1986), but a profit nonetheless was predicted for the year. Immediately after that announcement, the

stock price declined to approximately $3.50 per share.

The plaintiffs commenced this action on January 22, 1987, alleging, *inter alia,* that the disclosure documents distributed to potential investors in connection with the company's two public offerings of securities, subsequent reports to shareholders, and press releases contained misrepresentations or omissions of material facts. The plaintiffs further alleged that the patients' accounts receivable entries on the company's financial statements were materially overstated and that the corresponding provisions for doubtful accounts and contractual allowances were materially understated, not only as a result of improper accounting procedures, but, as a result of deliberate fraud. The plaintiffs' complaint, and the subsequent amendments thereto, also contained allegations of other material misrepresentations or omissions of material financial and nonfinancial facts.

During February 1987, after the company issued another announcement stating that it expected a loss for the fiscal year 1987, as opposed to a profit as had been announced on January 9, 1987, the price of the stock declined to the $2.00 per share range. On September 3, 1987, NHC announced a substantial loss for the 1987 fiscal year and the replacement of several officers and directors. The stock price immediately fell to below $1.00 per share, where it remains.

All but three defendants have filed answers denying all material allegations of the complaint. The remaining three defendants—Arthur Young & Company; Wood, Lucksinger & Epstein; and DSA Financial Corp.—were added to the case only shortly before settlement. At the time the settlement was reached, Arthur Young & Company and Wood, Lucksinger & Epstein had filed still-pending motions to dismiss on numerous grounds, including the failure to state a claim against them upon which relief could be granted. DSA Financial Corp. had requested and received an extension of time by this Court in which to file an answer or responsive motion to the complaint.

Prior to the proposed settlement agreement, the parties engaged in substantial discovery, primarily in the nature of document review and interviews of potential witnesses. All of the named plaintiffs produced documents for the defendants.[3] Further, a heavy schedule of depositions had begun, with approximately eight days of testimony having been taken. In the fall of 1987, it became clear to the parties that there was a substantial possibility of reaching a global settlement in the case. The parties then, by agreement, reduced the amount of time devoted to further discovery in an effort to save all parties unnecessary expense, and this Court later entered a formal order staying all discovery during the ongoing settlement negotiations.

After much arm's-length and good-faith bargaining, all the parties were able to sign one global settlement stipulation and to present that settlement stipulation to the Court on December 30, 1987. Additionally, the parties submitted to the Court a motion for preliminary approval of the settlement, a proposed order certifying a plaintiff class for purposes of settlement and conditionally approving the settlement,[4] and proposed forms of notice to be mailed to the class, notice to be published in the *Wall Street Journal,* verified proof of claim and release form, and request for exclusion form.

On December 30, 1987, the Court entered an order granting the motion for prelimi-

---

3. At the early stage of this litigation, a document depository was established in a building next to the law firm of Capell, Howard, Knabe and Cobbs in Montgomery, Alabama. During the course of this litigation, well in excess of 1,000,000 pages of documents have been deposited in the depository.

4. The parties in this case proposed to the Court a settlement for a class before a class had been certified. Federal courts have permitted, though with great caution, the use of "settlement classes." *See Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *In re Beef Industry Antitrust Litigation,* 607 F.2d 167 (5th Cir.1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

nary approval of the settlement and, pursuant to the schedule included in the order, plaintiff's counsel began mailing the approved notice to all persons who purchased common stock or debentures of NHC, at any time between November 5, 1985, through September 3, 1987, inclusive. On January 12, 1988, C & S Bank of Atlanta, Georgia, the transfer agent for NHC, mailed by first-class mail 1,450 notice packets to every holder of record of NHC stock at any time between November 5, 1985, and September 3, 1987, inclusive. Each such notice packet included the court-approved notice of class action certification and settlement and hearing, a copy of the settlement stipulation, a summary of the terms of the new preferred stock, a verified proof of claim and release form, a request for exclusion form, and a notice to certain brokers, etc. directing all nominee holders to forward the packet contents to any beneficial owners for whom such broker or nominee held NHC stock. On January 12, 1988, seventy-five additional packets were mailed to all beneficial owners during the class period of the debentures.

Of the 1,450 record holders during the class period identified by C & S Bank, one, Cede & Company, or its affiliate The Depository Trust Company ("DTC"), actually is a "street name" holder for other brokers, institutions, and clearing houses. Plaintiff's counsel were able to obtain a list of DTC participants as of the end of the class period. Separate notice packets were mailed to all 1,110 of such participants. In addition, plaintiffs' counsel established a "telephone bank" and directly phoned all 1,100 of such DTC participants to remind them of the settlement and the court-established deadline. The response plaintiffs' counsel received from such DTC participants was very positive. When stock is held in "street name," the beneficial owner may elect to have his identity kept confidential. For such persons, plaintiffs' counsel had to rely to some extent on the "street name" holders to fulfill their duties to their clients and forward to them the appropriate information. Plaintiffs' counsel also had to rely on the notice published nationwide in the *Wall Street Journal*.

Plaintiffs' counsel did obtain a "NOBO," Non–Objecting Beneficial Owner, list of persons whose stock was held in "street name" by a DTC participant, but who did not request that their names be kept confidential. Plaintiffs' counsel mailed 1,483 packets to such non-objecting beneficial owners between February 21 and 25, 1988.

In response to requests for packets from brokers and/or individuals, plaintiffs' counsel have mailed more than 5,800 additional notice packets to potential class members. Although over 10,000 packets have been mailed, the class in this case is not in actuality that large. The use of so many stockholder lists necessarily results in a great deal of duplication. Additional duplication is created because many of the brokers maintain their records on a transaction basis. As a result, a shareholder may receive one packet as a record holder, one packet as a non-objecting beneficial owner, and one packet from his broker for each purchase or sale transaction. This Court is of the opinion that although such duplication does carry some economic costs, plaintiffs' counsel are to be commended for their good-faith effort to notify every single class member.

■ In addition to the foregoing, notice was published nationwide in the January 19, 1988, edition of the *Wall Street Journal*. The former Fifth Circuit Court of Appeals has made it clear that Rule 23(e) of the *Federal Rules of Civil Procedure* mandates individual notice only to those potential class members who can reasonably be ascertained. *In re Beef Industry Antitrust Litigation*, 607 F.2d at 178–79; *see also Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (finding class notice sufficient even though only 2,500,000 or 41.7% of a 6,000,000–member class were identified); *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1099 (5th Cir.1977) ("Obviously, the word 'reasonable' cannot be ignored [in Rule 23(c)]. In every case, reasonableness is a function of anticipated results, costs, and amount involved. A burdensome search through records that may prove not to contain any of the information

sought clearly should not be required. On the other hand, a search, even though calculated to reveal partial information or identification, may be omitted only if its costs will exceed the anticipated benefit."). This Court is of the opinion that the notice given to members of the plaintiff class by publication and by mail, as aforesaid, complied with all requirements of due process, all requirements of Rule 23 of the *Federal Rules of Civil Procedure*, and constituted the best notice practicable under the circumstances. This Court is further of the opinion that any additional expense in locating and notifying any class members who may not have received notice would be outweighed by the tremendous expense of doing so, and which expense would materially reduce the fund available for all class members.

Prior to the February 8, 1988, cutoff established by the Court for the filing of requests for exclusion, sixteen such requests were filed with the Court. Twelve additional requests for exclusion have been filed with the Court since that cutoff date. With leave of the Court, plaintiffs' counsel have in good faith attempted to contact each of the persons requesting exclusion, and all of the persons requesting exclusion plaintiffs' counsel have been able to contact did so only by mistake due to the similarity of that form and the proof of claim form. Of the remaining persons requesting exclusion, several did not suffer a loss on their purchase of NHC stock and still others purchased their stock outside the class period and are not class members. Four objections and no notices of appearance were filed with the Clerk of the Court by the deadline for filing such matters. The Court will discuss *infra* those four objections. None of the objections, however, contend that the settlement should not be approved. Two of the four objections relate only to the petition for attorneys' fees; one simply makes a suggestion with respect to the plan of distribution. The remaining objection filed by the "Maddox Class" requests this Court to rewrite the releases which are a part of the settlement stipulation and agreement so that these individuals will not be estopped from bringing a common law fraud action in state court against certain individual defendants herein.

As of February 29, 1988, 1,139 claim forms had been returned to the Clerk of this Court representing a class-wide loss among the purchasers of the stock (rather than the debentures) of NHC in excess of $4,000,000.

## II. DISCUSSION

■ Because "[c]ompromises of disputed claims are favored by the courts," *William v. First National Bank*, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910), it is "the policy of the law generally to encourage such settlements," *Florida Trailer and Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960), and accordingly class-action settlements will be disapproved only upon "considerable circumspection." *Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479, 481 (E.D.Pa.1975). Due to the notable unpredictability of result in complex securities litigation and the distinct possibility of litigation spanning up to a decade or more, securities fraud class actions readily lend themselves to settlement. *See, e.g., Levin v. Mississippi River Corp.*, 59 F.R.D. 353, 363 (S.D.N.Y.1973), *aff'd sub nom., Wesson v. Mississippi River Corp.*, 486 F.2d 1398 (2d Cir.), *cert. denied*, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973); H. Newberg, *Newberg On Class Actions* (2d Ed), § 22.79, at 155 (1985).

■ Due to the nature of class actions by which the claims and rights of numerous faceless class members are adjudicated, usually without personal legal representation, it is the province of the Court as a fiduciary to the class to evaluate the fairness of the settlement. Courts generally weigh and analyze several factors, which have been stated in various terms by different courts, to determine whether the proposed settlement is fair and equitable under the circumstances. In this circuit, six factors have been enumerated for consideration:

(1) The existence of fraud or collusion behind the settlement;

(2) The complexity, expense, and likely duration of the litigation;

(3) The stage of the proceedings and the amount of discovery completed;

(4) The probability of plaintiffs' success on the merits;

(5) The range of possible recovery; and

(6) The opinions of the class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983). *See also, In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 217 (5th Cir.1981).

### A. *The Absence of Fraud or Collusion Behind the Settlement.*

■ The settlement in this case was reached only after months of tense arm's-length bargaining. At times, settlement talks were broken off when each side firmly refused to give any more. Not only were the discussions between opposing counsel adversarial, there were also strong disagreements between several factions of the defendants. The interests of the numerous parties to this case are so diverse that collusion would be virtually impossible. Plaintiffs' counsel have certified to this Court that they agreed to the proposed settlement terms only because they felt such terms to be in the best interest of their clients, the class representatives, and the entire putative class. Plaintiffs' counsel have represented to this Court that they believe that any additional class benefits that could be achieved by harder bargaining or further litigation are outweighed by the costs, economic and otherwise, of such tactics.

Accordingly, this Court is of the opinion that this factor weighs in favor of approval of the settlement.

### B. *The Complexity, Expense, and Likely Duration of the Litigation.*

This Court is well aware of the complexity of this litigation. In fact, this Court could well serve on the bench another thirty years without ever encountering a case as complex as this one. The third amended complaint is over 150 pages long and contains detailed factual allegations arising out of a complex course of alleged financial manipulations involving numerous fraudulent public filings and financial statements spanning a 2–year period. The case is premised upon alleged violations of federal and state securities law—a very difficult area of practice. In addition to the normal intricacies and complexities of a securities fraud case involving two public offerings of stock and one public offering of debentures, this case presented several novel and complicated questions of law.

Had this case been litigated, this Court would have been required to decide complex, sometimes novel, issues of securities law such as: determining controlling person and "control group" liability; the duties and responsibilities of securities counsel and accountants, both before and after a public offering of securities, to discover and/or disclose material facts; the status of venture capital selling warrantholders as "statutory underwriters" or "sellers" in a firm commitment underwriting; the duties of disclosure regarding so-called "soft" information such as earnings forecast; the investigatory duties of "market makers"; the liability of participating underwriters for the errors, omissions or deliberate fraud of lead underwriters to whom they delegate their duties of investigation and due diligence; and, the issue of whether NHC's indemnification provisions and agreements violate the public policy of the federal securities laws by allowing the advancement of litigation expenses to individual defendants without requiring such defendants to post security for such advancements.

It is also likely that this Court would have been called upon to decide complex, novel issues of state law, such as the extent of the duty lawyers and accountants owe to investors, and whether officers and directors, and those acting with them, owe fiduciary duties only to the corporate entity or directly to the shareholders, or both.

The civil RICO claims asserted in this case are by their very nature complex. These claims presented a difficult question regarding the level of "participation" that

is required to fall within the strictures of RICO. For example, does an outside auditor or attorney manage or "participate in" the affairs of the alleged RICO enterprise so as to justify a RICO judgment when the auditor or lawyer's participation is indirect, for instance, as an aider and abettor? This Court understands that that very issue is presently pending before the United States Court of Appeals for the Eleventh Circuit.

This case also presented particularly novel and difficult procedural problems. For example, plaintiffs named the underwriters as a putative defendant class. This raises a question only heretofore considered by the Second and the Ninth Circuits. Another such issue already addressed by this Court is whether a preliminary, pre-certification notice to all the putative defendant underwriter class members was necessary in order to satisfy due process concerns.

The prosecution of such a case necessarily requires a great deal of time and expense. Although only five depositions have been begun or completed, the plaintiffs have already spent well in excess of $100,000.00 in expenses. The accountants for the plaintiffs have barely begun their "audit" of the produced records, but already have compiled a bill for their time and expenses in excess of $22,000.00.

Had this case proceeded to trial, such expenses would have been multiplied many times. Probably, over 100 depositions would have been taken at places as far away as San Francisco, California; New York, New York; and in places as remote as England, Arkansas, and Pineville, Louisiana. Further, the trial of this case would have taken at least several months. Any verdict no doubt would have been appealed with the prospect of additional trials and additional appeals. In the end, this case could have lasted in this court for years, and the final result may not have been any more favorable to the plaintiff class members than the settlement presented to this Court.

Accordingly, this Court is of the opinion that all of these factors weigh in favor of approval of the settlement.

### C. The Stage of the Proceedings and the Amount of Discovery Completed.

In this case, it is this Court's opinion that the plaintiffs have conducted enough discovery to be able to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation. The law is clear that early settlements are to be encouraged, *Stull v. Baker*, 410 F.Supp. 1326, 1332 (S.D.N.Y.1976) ("the courts, as well as the law, favor the compromise of disputed claims."); *Jamison v. Butcher & Sherrerd*, 68 F.R.D. at 481; *Siegel v. Realty Equities Corp. of New York*, [1973 Transfer Binder] *Fed.Sec.L.Rep.* (CCH), ¶ 94,102, at 94,444, 94,445 (S.D.N.Y., July 30, 1973) [available on WESTLAW, 1973 WL 414], and accordingly, only some reasonable amount of discovery should be required to make these determinations. *See In re Corrugated Container*, 643 F.2d at 211 (lack of presettlement discovery does not in itself invalidate settlement since plaintiffs' negotiators had access to a plethora of information regarding the facts of their case); *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir.1977).

Only three depositions have been completed. However, Steven Phelps, the founder and former Chairman of the Board, President and Chief Executive Officer; and L. Stanton Tuttle, a former Chief Operating Officer and Director of NHC, gave several days testimony in depositions which were begun but not yet completed.

Nonetheless, in a case such as this, based in large part on allegations of financial wrongdoing, misrepresentations or omissions of material fact in disclosure documents, and deliberate fraud, document discovery tends to be much more important than the taking of depositions. The plaintiffs have been engaged in serious document discovery since the early days of this case. As previously noted in this opinion, a document depository for the indexing and storing of documents was established in Montgomery, Alabama, at which plaintiffs' counsel have spent many months reviewing over a million pages of documents.

If placed together, these documents would easily fill a warehouse.

An important factor that has mitigated the plaintiffs' need for substantial depositions is the fact that two of the class representatives are former employees of NHC who have a great deal of knowledge concerning the company's operations and who first discovered the facts upon which the case is based. Further, plaintiffs' counsel have engaged in substantial and formal discovery of the case and have obtained copies of documents and numerous affidavits and statements from independent witnesses regarding the facts alleged in the case. The plaintiffs' counsel have represented to this Court that, based upon their own investigations, the voluminous documents that have been produced, and the depositions that have been taken to date, they have a sufficient understanding of the merits of the plaintiffs' case, the range of possible recovery, and the likely duration and expense of continued litigation to make an informed recommendation regarding the proposed settlement and the terms thereof.

Accordingly, this Court is of the opinion that this factor weighs in favor of approval of the settlement.

D. *The Probability of Plaintiffs' Success on the Merits;* and

E. *The Range of Possible Recovery.*

A Court is to consider the likelihood of the plaintiffs' success on the merits of their claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise. *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed. 2d 59 (1981), *citing Protected Committee for Independent Stockholders v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). In footnote 14, the Supreme Court points out "[courts] do not decide the merits of the case or resolve unsettled legal questions." *Id.*

The most important point to consider in connection with these factors is the distinction between the defendants and their respective roles in the alleged wrongdoing. For instance, under § 11 of the Securities Act of 1933, the issuer, i.e., NHC, is strictly liable for any material misrepresentations or omissions of material fact contained in the two registration statements filed with the Securities Exchange Commission and which are made the basis of this lawsuit. A significant problem is that NHC presently has no money to spare to pay a multimillion dollar judgment.[5] This Court is of the opinion that it is in the best interest of the plaintiff class for NHC to survive and to continue to be able to conduct business. If this Court fails to approve the settlement presented by the parties, and this litigation were to continue, NHC would face certain bankruptcy. That certainty would not inure to the benefit of the plaintiff class and is a primary reason for this Court's approving the settlement. Additionally, no matter what the jury's verdict might have been in this case, the plaintiffs could not collect any more from the company than the settlement provides them anyway.

Similarly, the combined wealth of the individual defendants, *i.e.,* those who are alleged to actually have planned and masterminded most of the alleged frauds, does not even approximate the class-wide losses

---

5. From the time the complaint in this cause was initially filed, this Court has expressed its concern to all counsel of record relative to NHC's financial condition. Indeed, at the initial conference in this case, the Court raised the question with counsel of the possibility of NHC's filing a petition for bankruptcy and the net effect that would have on this case. On February 26, 1988, NHC filed a Form S–1 Registration Statement under the Securities Act of 1933 with the Securities and Exchange Commission in Washington, D.C. The S–1 was introduced in evidence as a joint exhibit at the final settlement hearing. The Court has read the entire S–1, but particularly notes the dismal financial performance of the company found at pages 8–10 of the S–1. Concerning Recent Financial Performance, the following statement is made: "The Company's financial performance has deteriorated significantly in recent periods. The Company reported a net loss of $24.8 million for the fiscal year ended June 30, 1987, and a net loss of $14.3 million for the six months ended December 31, 1987...." (See S–1 at page 8.) It thus remains apparent to this Court that NHC totters precipitously on the edge of bankruptcy.

of the investors. To get any meaningful recovery from the individual defendants, the plaintiffs would have to look to NHC's "D & O" (Directors' and Officers') insurance policy. If the plaintiffs were to prove the frauds alleged, they probably also would have to successfully litigate the insurance carrier's defense that the existence of fraud on the part of NHC's officers' precludes insurance coverage. Moreover, this D & O policy, which has a limit of $10,000,000 also pays the individuals' attorney's fees and litigation expenses. The longer the duration of the litigation, which would undoubtedly take years, the lower the fund that would be left to pay the plaintiffs' damages. Only the individual defendants' attorneys, who have been paid substantial fees already, would come out ahead.

Of the remaining defendants, the largest group is the underwriters. The combined net worth of the three lead underwriters and the 70–plus participating underwriters probably totals several billion dollars. Those defendants could easily satisfy any judgment the plaintiffs may achieve. The problem here is that the underwriter defendants have asserted a defense that, if any fraud (which they deny) is proven, they were defrauded just as were the plaintiffs. Indeed, the plaintiffs have made an allegation that NHC placed its employees, who were not sick or in need of hospitalization, in hospital beds to raise such hospital's patient census. But, on one such occasion, the employees were allegedly placed in the beds while the underwriters were touring the hospital as part of their "due diligence" investigatory tour. Although the plaintiffs have made other allegations against the underwriters, such underwriters may successfully be able to convince a jury that they acted in good faith but were defrauded by NHC personnel as were the plaintiffs.

Furthermore, the underwriters have raised an "expertising" defense, that the financial portions of the various disclosure documents were prepared by "experts," i.e., Arthur Young & Company, and that they were entitled to rely on such expertised portions of the disclosure documents without further inquiry. Although the plaintiffs' claims are not premised solely on the financial portions of the disclosure documents, and although the plaintiffs would argue that the underwriters could not turn their eyes from what they could plainly see, that is a defense that the plaintiffs would have to overcome.

The plaintiffs' ability to prove liability of the venture capital defendants, i.e., the selling warrantholders, depends in part on the plaintiffs' theories of "statutory underwriter" or "seller" status of such defendants in a firm commitment underwriting, and/or such defendants' liability as "control persons."

■ With respect to the first basis of liability, the plaintiffs would have to prove that the selling warrantholders did not purchase their stock for investment purposes but with a view towards resale. That is a question of fact. Even if the plaintiffs were to prove that the selling warrantholders fell within the statutory definitions of "underwriter" or "seller," they would still have the usual defenses available to such underwriters as described above.

With respect to the second basis of liability, the plaintiffs would have to prove facts indicating the selling warrantholder's control or ability to control the decisions of another liable party, such as NHC, and also would have to overcome the selling warrantholder's affirmative defense that they did not know, and could not, in the exercise of reasonable diligence, have known, of the alleged misrepresentation or omissions of material fact.

The remaining defendants in this case are the professionals—the accounting firm of Arthur Young & Company and the law firm of Wood, Lucksinger & Epstein. This Court doubts that if forced to litigate these defendants would ever admit any liability. Each of these defendants would no doubt litigate this case furiously. As a practical matter, the claims against the professionals would be difficult to prove because the liability of these defendants is premised in part on a failure to discover the wrongs of other defendants or to take appropriate

corrective action with regard to disclosures which the attorneys and accountants drafted or reviewed.

These examples of the various defendants' positions and defenses, though indicative of the obstacles and roadblocks in the plaintiffs' path, do not mean that the plaintiffs could not overcome such difficulties and prove their case. Nonetheless, as so often is the case, the easiest claims for the plaintiffs to prove are those against the "judgment proof" defendants. The claims against the defendants with sufficient capital to satisfy a multimillion dollar judgment, even though perhaps winnable, are by their very nature more difficult to prove.

Accordingly, this Court is of the opinion that these factors weigh in favor of approval of the settlement.

### F. *The Opinions of the Class Counsel, Class Representatives, and Absent Class Members.*

Before, during, and even since the negotiations leading to this proposed settlement, plaintiffs' counsel have represented to this Court that they have kept in mind the factors enumerated above. If plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement. This Court is well aware that each of the plaintiffs' counsel is experienced in class action litigation. Particularly, the Ritchie and Rediker law firm devotes the majority of its litigation practice to securities class action litigation. The Court also is aware that Edward L. Hardin, Esq., of the firm of Hardin and Taber, and one of the plaintiffs' counsel herein, is one cf the most able and experienced trial lawyers in the State of Alabama. With the exception of the Honorable Carolyn Duncan and David Donaldson, Esq., this Court is personally familiar with each of the remaining plaintiffs' counsel and knows them to be able, experienced and conscientious lawyers.

Moreover, before signing the settlement stipulation, plaintiffs' counsel discussed the proposals with the named plaintiffs, discussed the various considerations, and gained their approval to the settlement terms.

With respect to the views of the absent class members, close to 10,000 notice packets have been mailed to prospective class members but out of thousands of recipients, only four have raised objections of any type. Professor Hill and Dr. Cosby have objected only to the attorneys' fee request.[6] They appear to be otherwise satisfied and, in Professor Hill's case, "delighted," with the settlement terms.

Mr. Norman Gomberg has raised an objection to the plan of distribution. The Court views Mr. Gomberg's objection to be more in the nature of a helpful suggestion with respect to administration of the settlement funds. Mr. Gomberg states that as it is apparent that the class-wide loss as represented by the filed claim forms will not even come close to $60,000,000, the ratio of a class member's loss to one share of the new preferred stock he receives in settlement should be lowered from $250.00/one share of new stock to $100.00/one share of new stock. The thrust of Mr. Gomberg's suggestion, as this Court understands it, is to give the small shareholder, whose losses may not approach $250.00, greater opportunity to participate more fully in the NHC distribution plan.

Plaintiffs' counsel have responded to Mr. Gomberg's suggestion and explained that their intent is to divide the final sum of all the class members' losses who file claims by the 240,000 shares of new stock to be distributed to the class members participating in Fund A, which is set aside for the class members who purchased stock, rather than debentures, of NHC. In other words, if the class-wide loss as represented by the claim forms totals $24,000,000, class members will receive one share of the new preferred stock for every $100.00 of their loss as opposed to the $250.00 figure used as an estimate in the notice ($24,000,-

---

**6.** The Court will address these objections to the fee request in a separate memorandum opinion.

000/240,000 shares equal $100.00 loss per share of new stock).

Finally, an objection to the class definition and form of release was filed by several persons, some of whom are class members and some of whom are not. This group calls themselves the "Maddox Class."[7] At the hearing on final approval of the settlement, several members of this group appeared with their counsel.

 Initially, the Court understood the "Maddox Class" to have two complaints: (1) the members of the "Maddox Class" who have bought NHC securities only outside the class period believe they should be added to the class of persons who bought within the class period, but without giving up any rights or claims they may have with respect to the stock they bought outside the class period; and (2) the members of the "Maddox Class" who have bought NHC securities both inside and outside the class period believe they should be allowed to also include in the settlement distribution the stock they bought in a private offering before the beginning of the class period. This Court is of the opinion that the former are without standing to object to the settlement (and are not barred or affected by it) and that the latter's objections are without merit and equity and would do a disservice to the remaining 99% of the plaintiff class and to NHC in which the class members are to receive new stock as a part of the settlement.

Mark Kahler, Gary Smith, Roger Campbell, and Bruce and Mary Jo Woodham, all of whom are denominated "plaintiffs" and members of the alleged "Maddox Class" as well as purported members of the class in the *Mashburn* action, purchased stock of NHC only in a private placement prior to the beginning of the class period. They are not members of the plaintiff class in

this action, nor could they be because they did not purchase NHC stock in reliance on the allegedly misleading disclosure documents, nor did they purchase during the class period which commences with the initial allegedly misleading disclosure document—the November 5, 1985, prospectus. Indeed, every single event that is alleged in this case to have been wrongful or to have damaged any investors in NHC occurred after these members of the "Maddox Class" already had purchased their stock. Because these five members of the "Maddox Class" are not, and cannot be, members of the plaintiff class in this case, due to the fact that they purchased their stock before the alleged wrongdoing occurred, this Court is of the opinion that they lack individual standing to object to the settlement or any of its terms. *In re Iomega Securities Litigation,* [current binder] *Fed.Sec.L.Rep.* (CCH), ¶ 93,542, at 97,428 (D.Conn. Oct. 1, 1987) [available on WESTLAW, 1987 WL 43391]; *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 754 (D.C.N.Y.1985).

██ Specifically, the "Maddox Class" does not, and cannot, have a cause of action under Rule 10b–5 (one of the primary claims in this case) because the alleged diminution in value of their stock is not "in connection with" the purchase or sale of a security. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731–33, 95 S.Ct. 1917, 1923–24, 44 L.Ed.2d 539 (1975). Their private placement stock was issued in reliance on a private offering exemption to registration which may not be freely traded.

The "Maddox Class" complains that it should have claims added to this case for purposes of settlement, which claims it does not even possess or which do not

---

7. While this group continuously refers to themselves as a "class," they are not a "class" or even a "sub-class" as defined in Rule 23, of the *Federal Rules of Civil Procedure.* The objectors apparently misunderstand the nature of class action lawsuits. By listing a group of individuals who are not members of the plaintiff class as "plaintiffs," by denominating an objection filed on their behalf as a "class action," by asserting that the requirement of typicality is not met in

this case because a small number of several thousand shareholders allegedly also have additional claims, and by asserting that class certification should be denied because they are not included, the objectors indicate to this Court their lack of familiarity with an understanding of the class action device. However, some of the individuals in the "Maddox Class" are members of the "settlement class" previously certified by this Court.

exist. This Court is of the opinion that this is an insufficient basis for refusing to certify the class as they have defined it, for refusing to approve the settlement, or for modifying either the class definition or settlement terms to include the "Maddox Class"' private placement puchases.

 In their brief objecting to the settlement, those members of the "Maddox Class" who purchased outside and within the class period question:

Whether the Maddox Class should be forced to take minimal benefits under the Mashburn proposed settlement and thereby waive their independent cause of action arising under their pre-November 5, 1985, stock purchases.

Additionally, at the final hearing in this cause, counsel for the "Maddox Class" stated to this Court that the "Maddox Class" members simply want this Court to rewrite the releases contained in the settlement stipulation so that they can proceed against certain individual defendants in state court under a common-law theory of fraud. Alternatively, counsel for the "Maddox Class" made a request of this Court to extend the time previously set by order of this Court for "opt outs." The Court declines to grant either request.

This Court finds it difficult to comprehend how the "Maddox Class" can complain that the benefits of this settlement are only "minimal." Based on the latest figures provided to the Court by the Clerk of this Court concerning the number of claim forms which have been filed, it is entirely possible that a greater than 50% net return could be made to each participating member of the plaintiff class. With such a return on the loss the members of the "Maddox Class" suffered on the stock they purchased *during the class period,* they may still recover more than a 50% return on all their purported claims.

The objectors state that "[t]he proposed settlement, plan of distribution, and releases would prejudice the 'Maddox Class' by forcing them out of a cause of action for the reduction in value of their stock purchased prior to the November 5 offering." Assuming the "Maddox Class" has a claim

worth protecting and that it is not already time-barred regarding fraud in connection with their original purchases of NHC stock in a private sale completed five years ago, there are fundamental flaws in the "Maddox Class'" complaint. Namely, if the allegations of this case were proven true, the "Maddox Class" would have no damages because the plaintiffs would have proven that the "value" the "Maddox Class" claims to have been lost was all fictitious. Furthermore, the "Maddox Class" has no independent cause of action because its members' injury "arises only from the loss in value of their stock as a result of injury to the corporation." *Stevens v. Lowder,* 643 F.2d 1078, 1080 (5th Cir.1981 Unit B) (affirming decision of Judge Lynne of the Northern District of Alabama), *reh'g denied,* 652 F.2d 1001 (1981). *See also, e.g., Warren v. Manufacturers National Bank of Detroit,* 759 F.2d 542, 544 (6th Cir.1985); *Cates v. International Telephone & Telegraph,* 756 F.2d 1161, 1181 (5th Cir. 1985); *Martens v. Barrett,* 245 F.2d 844, 846 (5th Cir.1957).

An action to redress injuries to a corporation cannot be maintained by a shareholder in the his own name but must be brought in the name of the corporation. The shareholder's rights are merely derivative and can be asserted only through the corporation. Although this rule does not apply in a case where the shareholder shows a violation of duty owed directly to him, dimunition in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right.

*Stevens v. Lowder,* 643 F.2d at 1080 (cites omitted).

Furthermore, as previously mentioned, members of the "Maddox Class" who purchased additional stock during the class period had every right to "opt out" of the class and pursue that litigation. The notice mailed to the "Maddox Class" clearly explained that right, and class counsel has represented to this Court that they also personally explained that right to counsel for the "Maddox Class," and to individual members of the "Maddox Class." For

whatever reasons, the members of the "Maddox Class" did not "opt out" of the class within the deadline established by this Court. Moreover, the five members of the "Maddox Class" who are not members of the plaintiff class in this case are not affected by anything that goes on in this case. They cannot be prejudiced by any release because they cannot sign one. The final judgment the Court will enter in this cause will not prejudice them because they are not class members.

The remaining members of the "Maddox Class" who purchased NHC stock both before and during the class period had a choice. They could have elected to participate in the settlement and sign a release giving up all their claims involving any purchases of NHC stock, or they could have refused to sign such a release, opted out of the class, and pursued any individual claims they believed to be meritorious. With full knowledge of the consequences of their actions, the "Maddox Class" members made their own choice to forego their right to "opt out." The members of the "Maddox Class" have not been forced to waive anything. Now, this contingent of the "Maddox Class" wishes to have their cake and eat it too.

This Court understands that the release could have been worded so as not to affect any claims class members may have had against the defendants, but which arose outside the class period. However, it was represented to the Court at the final settlement hearing that the language of the release was made a condition to the defendants' agreement to the remainder of the settlement terms. Indeed, if the language of the release is altered by this Court, the defendants have retained the right to back out of the settlement. Furthermore, because the class members will receive as a part of the settlement additional equity shares of NHC stock, it now is in the class members' interests as well as the interests of the defendants to avoid any possible future lawsuits against NHC. As previously discussed in this memorandum opinion, NHC is a struggling company, and if the plaintiffs voluntarily pave the way for additional lawsuits against it, they will at the same time be lessening the value of the new stock being issued to the class members.

▇▇▇ In determining whether a class settlement should be approved, this Court must decide whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued. The settlement must be fair, reasonable, and adequate under the circumstances. While this Court is sympathetic with the members of the "Maddox Class" who lost money in their purchases of NHC stock, this Court cannot permit an exception to the February 8, 1988, deadline for opting out of the class. Further, this Court refuses to rewrite the release to benefit only those members of the "Maddox Class" while working to the detriment of the 99% of the remaining class members in this case. The "Maddox Class" was presented a set of options and chose not to protect their individual claims by opting out of the class. They voluntarily chose to forego that right. Accordingly, it is the opinion of this Court that the Maddox group's objections are not well taken and are due to be overruled.

Accordingly, it is the opinion of this Court that this factor weighs in favor of approval of the settlement.

## III. CERTIFICATION OF A CLASS FOR PURPOSES OF SETTLEMENT

On December 31, 1987, this Court certified for purposes of settlement, conditioned upon final approval of the settlement, a plaintiff class of all persons who purchased common stock or subordinated debentures of NHC. At any time from November 5, 1985, through September 3, 1987, inclusive, excluded from the class as defined in that order are:

(i) all defendants, each member of the immediate family of each individual defendant, trusts for the benefit of a defendant or for the benefit of an immediate family member of a defendant, and the general partners of the defendant partnerships and members of the immediate family of such general partners; (ii)

all persons who controlled or presently control any defendant within the meaning of 15 U.S.C. sections 78t or 78o or otherwise; (iii) all persons who acted as underwriters, salesmen, brokers or dealers in connection with the issuance, offer, distribution or sale of National Healthcare, Inc. common stock or debentures at any time between November 5, 1985 and September 3, 1987 and all persons who controlled or presently control any such underwriter, salesman, broker or dealer within the meaning of 15 U.S.C. sections 78t and 78o or otherwise; (iv) any employee, partner or agent of the accounting firm of Arthur Young & Co., the law firm of Wood, Lucksinger & Epstein, the law firm of Cahill, Gordon & Reindel, or any accounting firm whose opinion was included in any registration statement filed by National Healthcare, Inc. with the SEC or included in any prospectus issued by National Healthcare, Inc.; and (v) transferees, nominees, or representatives of anyone listed in subparagraphs (i)—(v) who acquired or took any common stock or debentures of National Healthcare, Inc. without paying full and adequate consideration therefor.

This Court is well aware that the *Manual for Complex Litigation,* Second (1985) has criticized the use of pre-certification temporary settlement classes. As previously stated in this opinion, however, the former United States Court of Appeals for the Fifth Circuit has addressed that very concern and squarely rejected it. (See cases cited in footnote 4, page 665 of this memorandum opinion.) Plaintiffs' counsel has represented to this Court that the class definition and definition of excluded persons have been carefully thought out. The only significant difference between the class definition and the definition of excluded persons contained in the settlement and such definitions as originally envisioned in the third amended complaint is that in the settlement the time period during which NHC shareholders made their investment has been extended forward thereby expanding the class. Plaintiffs' counsel have represented that they believe a forward extension of the class period is justified given that even after their prior announced cutoff of the class period in March 1987, NHC made additional writeoffs of its bad debts. The date of September 3, 1987, was chosen because on that date NHC announced additional writeoffs, a substantial loss in the fiscal year 1987, and the resignations of several top officers. On the following day, September 4, 1987, an article was published about this case in the *Wall Street Journal.* That article led to a great deal of publicity about the case and probably put the investing public on notice of the alleged frauds.

On the other hand, extension of the class period backwards to a date earlier than November 5, 1985, would not be justified and plaintiffs' counsel have represented to this Court that they refused to even consider such an extension. There was no trading market in the stock prior to November 5, 1985, as that was the date of the initial public offering. Although there had been a private placement of the stock before November 1985, such stock was "restricted," and because it was sold through a private offering exemption, could not be freely traded. Moreover, this lawsuit alleges misrepresentations and omissions of material fact which occurred only after completion of that private offering and sale by several years.

## IV. CONCLUSION

For the reasons heretofore stated in this memorandum opinion, it is the opinion of this Court that the interests of the class as a whole are better served if this litigation is resolved by the proposed settlement rather than pursued. Further, based upon the evidence presented at the final settlement hearing, the documents submitted to the Court in support of the settlement, the objections thereto, and those matters contained in the memorandum briefs of the parties, this Court is of the opinion that the settlement is fair, reasonable and adequate under the circumstances. All counsel of record in this case are to be commended for achieving a settlement which is designed to compensate those members of the plaintiff

class and at the same time help to save a struggling company.

A separate final judgment approving the settlement will be entered in accordance with this memorandum opinion.

### FINAL JUDGMENT

This matter having come on for hearing before this Court on the 29th day of February, 1988, with respect to (a) whether the settlement stipulation filed on December 30, 1987, by and between the plaintiffs, by counsel, and the defendants, by their counsel, should or should not be approved; (b) whether the settlement of the claims asserted or which could have been asserted in this action by the plaintiffs and members of the plaintiff class against the defendants, based on the facts alleged in the plaintiffs' complaint, as amended, in accordance with the terms and conditions of said settlement stipulation, should or should not be approved and found to be fair, reasonable and adequate; and (c) whether all claims asserted in this action by the plaintiffs, for themselves and members of the plaintiff class, against the defendants, or which could have been asserted in this action, based on the facts alleged in the complaint, as amended, should be dismissed with prejudice, and the Court having found that the notice given to members of the plaintiff class by publication and by mail, as aforesaid, complied with all requirements of due process and all requirements of Rule 23 of the *Federal Rules of Civil Procedure,* and constituted the best notice practicable, under the circumstances, and the Court having been duly advised, it is, for the reasons stated in the Memorandum Opinion filed contemporaneously herewith, hereby FOUND, ORDERED, ADJUDGED and DECREED as follows:

1. The Settlement Stipulation filed on December 30, 1987, by and between the plaintiffs, for themselves and members of the plaintiff class, acting by their counsel, and the defendants, acting by their counsel, is hereby found to be fair, reasonable and adequate and is hereby APPROVED.

2. The notice of the pendency of this action and of the settlement of this action pursuant to the terms and conditions of the Settlement Stipulation heretofore given to members of the plaintiff class by mail and by publication is hereby found to be the best notice practicable under the circumstances of this case, and is hereby found to meet all the requirements of due process and Rule 23 of the *Federal Rules of Civil Procedure.*

3. This Court expressly finds and determines that there is no just reason for delay in the entry of this Order as a Final Judgment approving said Settlement Stipulation and dismissing with prejudice this action, and dismissing with prejudice all claims asserted in this action against the defendants, or which could have been asserted in this action by the plaintiffs or members of the plaintiff class against the defendants, based on the facts alleged in the plaintiffs' complaint, as amended, by the plaintiffs, on behalf of themselves and on behalf of members of the plaintiff class. Accordingly, the Clerk of this Court is hereby expressly ORDERED and DIRECTED to enter this Order as a Final Judgment pursuant to Rule 54(b) of the *Federal Rules of Civil Procedure.*

4. (a) *Plaintiffs' Release of Defendants.* Without any further action by anyone, each of the plaintiffs and each member of the plaintiff class defined in paragraph 6 of this Final Judgment shall be deemed to have released (i) each defendant and each defendant's insurers, officers, directors, partners, employees and attorneys, past and present; (ii) any underwriter who pursuant to an Agreement Among Underwriters participated in a public offering of National Healthcare, Inc., common stock and each underwriter's officers, directors, partners, employees and attorneys, past and present; (iii) Smith, Gambrell & Russell and Cahill, Gordon & Reindel and each of their respective partners and employees, past and present; and (iv) any other person, firm or entity, from all complaints and claims of such plaintiffs and members of the plaintiff class, known or unknown, arising out of any issuance, purchase or sale of the securities of National Healthcare, Inc.,

or arising out of or related to any of the matters or transactions alleged in or which could have been raised in the *Mashburn* action, or arising out of or related to the conduct of the *Mashburn* litigation or its settlement;

(b) *Defendants' Release of Plaintiffs.* Without any further action by anyone, each of the defendants shall be deemed to have released each plaintiff and each member of the plaintiff class and their officers, directors, partners, employees and attorneys, past and present, from all compulsory counterclaims, known or unknown, which could have been raised in the *Mashburn* action and from all complaints and claims arising out of or related to the conduct of the *Mashburn* litigation or its settlement;

(c) *Defendants' Release of Defendants.* Without any further action by anyone, in consideration of the dismissal and settlement of the *Mashburn* action as to all defendants, each defendant shall be deemed to have released the other defendants and their officers, directors, partners, employees and attorneys, past and present, from all claims, including claims for damages, indemnity, contribution or other recovery, known or unknown, which might have been asserted or maintained in any forum as of the date of the Settlement Stipulation and which (i) arise out of claims asserted or which might have been asserted against one or more of the defendants by plaintiffs and members of the plaintiff class in the *Mashburn* action; (ii) arise out of or are related to any issuance or purchase or sale of the securities of National Healthcare, Inc., or any defendant's participation or role in connection therewith; or (iii) arise out of or are related to the conduct of the *Mashburn* litigation or its settlement. (The defendants may hereafter agree among themselves as to further assurances and/or documentation with regard to the aforesaid mutual release, as between and among said defendants, but the plaintiffs and class members shall have no responsibility to see to the effectuation of such mutual releases as among the defendants, and the delivery of any such additional mutual releases as between or among any of the defendants, or the failure

of such delivery, shall not be a condition to effectuation of the settlement provided for in said Settlement Stipulation or the closing and effectiveness of the transactions provided for in said Settlement Stipulation, assuming this Final Judgment becomes no longer appealable or subject to modification on appeal.) Nothing herein shall be construed as a release of any defendant from defendant's obligations under said Settlement Stipulation or under the commitment letters delivered to Patrick & Lacy, P.C., and described in paragraph 1 of said Settlement Stipulation, nor as a release of National Healthcare, Inc., from its obligations, if any, under certain severance, settlement, consulting, and lease agreements heretofore executed, its obligations, if any, under any agreements respecting the collection of accounts, and from its obligations, if any, to Arthur Young & Company for unpaid fees and expenses claimed by Arthur Young & Company, and nothing in this subparagraph (c) of this paragraph 4 of this Final Judgment shall constitute or be construed as a release of any insurance company from its obligations, if any, to any of its insureds, including National Healthcare, Inc., its officers and directors and its former officers and directors.

(d) All parties to this action and all members of the plaintiff class are hereby barred and enjoined from instituting and maintaining in this and any other jurisdiction any action based on the claims released herein.

5. This Court expressly reserves jurisdiction of this cause to enforce the terms and conditions of the Settlement Stipulation; to award to plaintiffs' counsel from the Settlement Fund legal fees for their services on behalf of the plaintiffs and members of the plaintiff class in this litigation, and for reimbursement of their out-of-pocket expenses in connection with this litigation; to enter such orders as this Court deems appropriate with respect to the distribution of the net proceeds of the settlement (consisting of Preferred Stock and cash); to approve or disapprove claims filed by members of the plaintiff class; and to enter such other and further orders as may be appropriate or necessary in order to

effectuate and distribute the proceeds of the settlement in accordance with the December 30, 1987, Settlement Stipulation in this action.

6. Pursuant to Rule 23(c)(3) of the *Federal Rules of Civil Procedure,* this Court finds and determines that the members of the plaintiff class who are bound by this Final Judgment are:

All persons or entities who purchased any shares of Common Stock or 14½% Subordinated Debentures of National Healthcare, Inc., a Delaware corporation, at any time from November 5, 1985, to September 3, 1987, inclusive, and any legal representative, executor, administrator or successor-in-trust or successor by operation of law of any such person. Excluded from this Class are (i) all defendants, each defendant's partners, and members of the immediate family of each individual defendant and of each individual partner of a defendant; (ii) all persons who controlled or presently control any defendant within the meaning of 15 U.S.C. §§ 78t or 78*o* or otherwise; (iii) all persons who acted as underwriters, salesmen, brokers or dealers in connection with the issuance, offer, distribution or sale of National Healthcare, Inc. common stock or debentures at any time between November 5, 1985, and September 3, 1987, and all persons who controlled or presently control any such underwriter, salesman, broker or dealer within the meaning of 15 U.S.C. §§ 78t or 78*o* or otherwise; (iv) any employee, partner or agent of the accounting firm of Arthur Young & Co., the law firm of Wood, Lucksinger & Epstein, the law firm of Cahill, Gordon & Reindel, or any accounting firm whose opinion was included in any registration statement filed by National Healthcare, Inc. with the SEC or included in any prospectus issued by National Healthcare, Inc.; and (v) transferees of anyone listed in subparagraphs (i)–(iv) who acquired or took any common stock or debentures of National Healthcare, Inc. without paying full and adequate consideration therefor.

Also excluded from the plaintiff class are those persons who have timely filed a Request for Exclusion which has not heretofore been revoked.